# Richmond

## SPENCER TILLMAN v. COMMONWEALTH OF VIRGINIA.

April 22, 1946.

Record No. 3093.

Present, All the Justices.

The opinion states the case.

*T. Helm Jones,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

Eggleston, J., delivered the opinion of the court.

Spencer Tillman, fifty-seven years old, a member of the Negro race, was found guilty by a jury of murder in the second degree for the killing of his wife, Estelle Tillman, and his punishment fixed at confinement in the penitentiary for five years. To review the judgment entered on that verdict the present writ of error has been allowed.

The couple had been married since 1938 and lived at 308 Cumberland street, in the city of Norfolk. The house has two stories. On the first floor is a front room, which was occupied by Carrie Scott, the foster mother of the deceased, a dining room, and a kitchen. Tillman and his wife occupied the front room on the second floor. The other two rooms on the latter floor were likewise occupied.

Although the accused at first denied the killing, he now admits that he shot his wife, killing her almost instantly, with a 25-caliber pistol, at about four a. m. on Monday,

April 16, 1945. Later we shall relate the circumstances under which he said the shooting occurred.

About 6:30 a. m. on the day of the shooting, the accused, whose occupation was that of a longshoreman, knocked on Carrie Scott's door, gave her money for the purpose of paying certain insurance premiums which were that day due on policies covering his wife and others, saying that he was going to work and that Estelle was "asleep" in the dining room. When Carrie Scott arose she saw Estelle lying on a sofa in the dining room, with her face to the wall, and apparently sleeping. She was lying in a perfectly normal position for one asleep. She was fully clothed and her garments were in no wise disarranged. About noon it was discovered that she was not asleep but dead.

At first the occupants of the house thought that the woman had died of natural causes, and when her husband (the accused) was notified of her death he said nothing to refute this surmise or to indicate that he even knew the cause of her death.

The body was removed to a funeral establishment where it was viewed by the coroner who discovered a small wound in the chest. He notified Nowitsky, the coroner's investigator, of this fact and the two men at first concluded that the death wound had been inflicted by a small sharp instrument, possibly an ice pick. A search of the Tillman home revealed such an instrument. Nowitsky then interviewed the accused and asked what had caused the woman's death. Tillman's reply was that he "didn't know," that "they said she had died a natural death," that he had gone to work about 6:30 in the morning and knew nothing about his wife's death until he had been "notified on the job" of it. Nowitsky then told the accused that an examination of the body showed that his wife had not died a natural death but had been murdered. The investigator questioned Tillman closely to ascertain whether the latter had not killed his wife with an ice pick. Tillman vigorously denied the imputation that he had killed her by this or any other means.

Later, an autopsy revealed that death had been caused by a 25-caliber bullet. Nowitsky then searched the premises of the accused for a second time and found a 32-caliber revolver in a bureau drawer in Tillman's bedroom. Since the caliber of this weapon did not match the smaller bullet which had caused the woman's death, the search of the premises was continued. Finally, a 25-caliber pistol was found concealed under a pan in the back yard.

The accused was again questioned and was told that his wife had been shot. He was shown the larger revolver and readily admitted that it was his. But he stoutly denied owning any other gun. The investigator accused Tillman of lying and told him that the death gun had been found in the back yard. For the first time, then, the accused admitted that he had killed his wife. In substance, his story was that he had caught her in the act of adultery with a strange man, and that in the heat of passion, engendered by this discovery, he had accidentally killed her with a bullet intended for the paramour.

In reply to this the detective said: "Spencer, you know your wife is a prostitute and has been living in this house plying her trade for years and you know no excitement didn't come up to cause you to shoot someone on account of her being with another man. * * * You two have been scrapping long enough, and now you have finally killed her. What have you got to say about that?"

Tillman's reply was: "Captain, you know how it is when you are living with a woman. I tried to get rid of her before."

The accused admitted having made this statement, but explained that he meant thereby that he had informed her that he would apply to the juvenile court for "instructions" or advice about his relations with her.

The police records revealed that the accused had been arrested and convicted a number of times for cursing, abusing, threatening, and even assaulting his wife. The records also showed that she had been arrested on numerous occasions for "soliciting for immoral purposes."

On cross-examination, the accused admitted that his wife drank to excess and that when she did so, to use his own words, she was "a tough nut and would fuss with me and quarrel with me."

He gave, at the trial, this story of how the killing occurred: His wife left home about eight o'clock in the evening preceding the shooting, saying that she would spend the night out. About nine o'clock he retired. At approximately 3:30 a. m. he was awakened by the "backfiring" of a passing automobile. His dogs in the back yard were whining and barking. He got up to investigate the cause of the disturbance and heard talking downstairs. Taking a flashlight and his 25-caliber automatic pistol, he went downstairs to the dining room where he discovered his wife and a strange man in the act of adultery on a sofa. He switched on the light and the couple ran into the kitchen. The man tried to escape through the rear door, but when Estelle reminded him of the vicious dogs in the back yard he returned to the dining room and faced the accused across the dining room table. To use the words of the accused, "I lost my mind and went crazy." Indignantly he inquired of the man, "What in the hell are you doing in my house at this time of morning with your clothes off?" At that instant, he said, his wife handed to her paramour what he (the accused) thought was a weapon of some kind and which later turned out to be an ice pick. The man struck at the accused with this weapon and when he did so the accused fired. But the wife stepped between the two men and received the bullet in her chest.

According to the accused the wounded woman fell on the sofa near by. He pursued the intruder down the hall, out the front door, and even to the porch where the man stumbled over a chair. As the man went down the hall and through the door, the accused tried to shoot him, but the pistol at first failed to fire. After the man had reached the porch the accused fired two shots which went wild, and the man escaped.

Upon his return to the dining room the accused found that his wife was dead. Her body was lying on the sofa with her face to the wall. Her clothes were smoothly and neatly arranged.

Mary Chamblee, an occupant of one of the rooms on the second floor, corroborated the story of the accused in some respects. She heard the voices of men talking downstairs, heard one pistol shot in the dining room, heard the noise of a person running to the front door and his stumbling over a chair on the porch, followed shortly thereafter by two pistol shots. But strange to say, she arose, dressed, and left the house at about eight o'clock, without making any inquiry as to the cause or result of the shooting and disturbance which she had heard.

A neighbor likewise testified that he heard the pistol shots fired on the front porch and saw a man running from the Tillman home. But he, too, so far as the record shows, made no investigation of the cause of the excitement.

Carrie Scott, the foster mother of the deceased, did not corroborate the story of the accused. About two a. m. she opened the front door for Estelle who was alone and passed down the hall to the dining room, from which the stairs led to the second floor. Later she heard Tillman and his wife talking in the dining room. Although this witness occupied the front room of the first floor, immediately adjacent to the hall, she heard no pistol shots and no noise of any such disturbance as that related by the accused.

Carrie Scott further told how Tillman had left the house about 6:30 that morning, after giving her the money to pay the insurance premiums and making no mention of the fact that his wife had been killed several hours before.

The accused first contends that there is not sufficient evidence to support a verdict of murder in the second degree. He argues that there is "no substantive evidence" contradictory of his testimony that he accidentally shot his wife with a bullet intended for her paramour when he (the accused) caught the two in the act of adultery, and that such conduct on the part of the wife and the intruder is sufficient provo-

cation, as a matter of law, to reduce the killing to manslaughter.

The principle upon which the accused here relies is thus stated by Mr. Freeman in the note in 92 Am. St. Rep. 214: "The rule of law is well established that if a husband detects his wife in the act of adultery and immediately slays her, or her paramour, the law does not entirely justify or excuse him, but holds the provocation sufficient, as [a] matter of law, to reduce the killing to manslaughter." See also, 26 Am. Jur., Homicide, sec. 28, p. 174.

Whether this principle is sound we need not stop to inquire. It, of course, does not apply unless the story of the husband be true. Although the version of the husband here may not be contradicted by any eyewitness, yet if there be circumstances casting doubt upon its credibility the jury was not bound to accept it. *Puckett* v. *Commonwealth*, 157 Va. 800, 808, 809, 160 S. E. 19; *Maxwell* v. *Commonwealth*, 167 Va. 490, 499, 187 S. E. 506, 510.

Here there are circumstances which cast doubt upon the husband's story that he came upon his wife and her paramour in the act of adultery. Moreover, even if that part of the story be true, there are further circumstances, as we shall presently see, which rebut his claim of sudden anger aroused by such a discovery.

One circumstance which discredits the story of the accused is its inconsistency. His story is a mixture of a killing prompted by righteous indignation at the discovery of his wife's infidelity, and a shooting in self-defense. But neither will bear even casual scrutiny.

While he says that he was so enraged and shocked to find his wife in this situation that he "went crazy," it is significant that he did not immediately shoot the paramour, although he had ample opportunity to do so while the intruder "was trying to get his pants up" and was backing into the kitchen. All this time, the man was unarmed. Not until after Estelle had passed her lover a weapon, with which the latter struck at the accused, did the accused shoot.

As to the claim that he shot at the intruder, in self-defense,

the accused admitted, on cross-examination, that when his antagonist lunged at him with the ice pick they were on opposite sides of the dining table.

Another circumstance tending to discredit the accused's version of the shooting is the series of falsehoods which he told the police investigator. He first denied even knowing how his wife had met her death. Later, when he learned that the police knew that she had died by violent means, he denied that he was the responsible agent. When told that she had been shot with a small-caliber pistol, he denied owning such a weapon. Not until he saw that the police could identify him as the person who had actually done the killing did he admit the homicide and advance his reasons therefor.

Again, the demeanor of the accused immediately following the homicide discredits his version of the killing. None of the occupants of the house was aroused or notified of what had occurred. There was no call for a doctor, or any effort made to see whether the woman's life might be saved. He even left the house about two hours later, after deliberately deceiving Carrie Scott and telling her that his wife was merely asleep.

Moreover, there is another significant circumstance which warranted the jury in rejecting the contention of the accused that he shot his wife while in the heat of passion engendered by his discovery of her in the act of an illicit relation with another man. The record is undisputed that for years she had had the reputation of being a common prostitute. The accused is bound to have known this. Indeed, as has been said, he admitted, on cross-examination, that he knew that she was "running around" with other men. Naturally, then, the jury did not believe his story that catching her in the act of adultery, even if that be a fact, would have so over-balanced his reason or shocked his moral or mental sensibilities as to have caused him to shoot her or her paramour.

The circumstances are similar to those in *Bryan* v. *Commonwealth*, 131 Va. 709, 109 S. E. 477. There the accused claimed that his wife's confession of an illicit relationship

and adultery provoked him to kill the paramour in the heat of passion. In rebuttal, the Commonwealth proved that the defendant knew his wife was of unchaste character. We held that it was for the jury to say whether, under these circumstances, the wife's confession of infidelity had prompted the killing in a heat of sudden passion. There a conviction of murder in the second degree was affirmed.

Here it was within the province of the jury to accept or reject the accused's version of the killing. Having rejected it, the homicide is presumed to be murder in the second degree, and the jury so found.

It necessarily follows from what has been said that the lower court was amply warranted in instructing the jury on both degrees of murder.

When the investigator, Nowitsky, learned from the coroner that the death of the decedent had resulted from a bullet of small caliber, he searched the premises of the accused for a pistol of that type. He testified, without objection, that he found a 32-caliber revolver in the room of the accused. The accused readily admitted the ownership of the pistol, but persisted in the denial that he owned any other weapon until he was confronted with a statement by Nowitsky that the 25-caliber pistol, the death gun, had been found in the back yard. He then admitted the ownership of both weapons.

No objection was made to the verbal testimony of this witness as to the finding of both of these pistols. Both were offered in evidence and objection was made to the introduction of the 32-caliber pistol on the ground that it was not involved in the shooting. This objection was overruled and is the basis of the next assignment of error.

There is no merit in this assignment. The police officer having testified, without objection, that the pistol was found on the premises of the accused, the introduction of the weapon itself, under these circumstances, was in no wise prejudicial to the accused.

Complaint is made of the action of the trial court in permitting the investigator, Nowitsky, to relate the conversation

which occurred between him and the accused in which Nowitsky said to the accused that the latter knew that his wife was a prostitute and had been plying her trade for years in her home.

This evidence was admitted on the theory that it constituted an implied admission or confession by the accused that he well knew his wife's unchaste character, and that, therefore, at the time of the shooting he could not have been laboring under any great provocation due to his finding her in an illicit relation with another man.

In our opinion the ruling of the trial court was correct. The jury had the right to consider the failure of the accused immediately to resent and deny the imputation, as an implied admission of the truth of the statement.

It is well settled that statements made in the presence and hearing of another, to which he does not reply, are admissible against him as tacit admissions of their truth or accuracy, when such statements are made under circumstances naturally calling for reply if their truth is not intended to be admitted. This principle rests upon that universal rule of human conduct which prompts one to repel an unfounded imputation or claim. *Mudd* v. *Cline Ice Cream Co.*, 101 W. Va. 11, 131 S. E. 865, 866; *Sanders* v. *Newsome*, 179 Va. 582, 592, 19 S. E. (2d) 883, 887; 20 Am. Jur., Evidence, section 567, p. 479.

The final assignment of error that the lower court erred in admitting proof of the violent character of the accused was abandoned in the oral argument before us and need not be considered.

On the whole we find no error in the record, and the judgment is

*Affirmed.*