# Richmond

## WILBERT LEE EVANS

### V.

## COMMONWEALTH OF VIRGINIA

December 4, 1981.

Record No. 811056.

Present: All the Justices.

*Stefan C. Long; E. Blair Brown* for appellant.
*Jerry P. Slonaker, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

A jury found Wilbert Lee Evans guilty of capital murder as defined by Code § 18.2-31(f), in the willful, deliberate, and premeditated killing of a law-enforcement officer for the purpose of interfering with the performance of the officer's official duties.[1] In the second stage of the bifurcated proceeding conducted pursuant to the provisions of Code §§ 19.2-264.3 and -264.4, the same jury fixed Evans's punishment at death. After considering the probation officer's report required by Code § 19.2-264.5, the trial court imposed the death sentence recommended by the jury. We have consolidated our automatic review of this sentence with Evans's appeal from his conviction, as authorized by Code §§ 17-110.1 (A) and -110.1(F), and we have given them priority on our docket in compliance with Code § 17-110.2. Evans asks us to reverse his

---

[1] The jury also found Evans guilty of using a firearm in the commission of a felony and fixed his punishment at confinement in the penitentiary for one year. The trial court entered judgment on that verdict, the judgment was not appealed, and the conviction is not pertinent to the present appeal.

conviction and remand the case for a new trial, or in the alternative to commute his death sentence to imprisonment for life.

## I. Constitutionality of the Capital Murder Statutes.

■ Evans contends that Code § 19.2-264.4C[2] is unconstitutionally vague and overbroad in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. He relies entirely, however, upon arguments that, as he concedes, we have recently rejected in *James Dyral Briley* v. *Commonwealth,* 221 Va. 563, 577-80, 273 S.E.2d 57, 65-67 (1980). We reaffirm our views expressed in that case. *See also Martin* v. *Commonwealth,* 221 Va. 436, 439-40, 271 S.E.2d 123, 125-26 (1980).

■ Evans also argues that Code § 19.2-264.2[3] is facially unconstitutional. He adopts the arguments that, as he further concedes, we rejected in *Smith* v. *Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 441 U.S. 967 (1979), and *Waye* v. *Commonwealth,* 219 Va. 683, 251 S.E.2d 202 (1978), *cert. denied,* 442 U.S. 924 (1979). *See Stamper* v. *Commonwealth,* 220 Va. 260, 267, 257 S.E.2d 808, 814 (1979), *cert. denied,* 445 U.S. 972 (1980). We reaffirm our views expressed in those cases.

## II. The Guilt Trial.

■ The Commonwealth presented evidence that Evans, a prisoner, fatally shot Deputy Sheriff William Truesdale on Janu-

---

[2] § 19.2-264.4C provides as follows:

The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

[3] **§ 19.2-264.2. Conditions for imposition of death sentence.**—In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

ary 27, 1981, while the officer was conducting him to jail in Alexandria. Evans admitted that he caused Truesdale's death with a firearm while the officer was engaged in the performance of his official duties. Evans consistently maintained, however, and so testified in his own defense, that he did not intend to kill Truesdale, and that the fatal shooting occurred accidentally while Evans was attempting to escape from police custody. Thus, the crucial question throughout the guilt trial was Evans's intent.

The uncontradicted evidence shows that Evans was in custody in North Carolina, that he volunteered to testify for the Commowealth in a habeas corpus proceeding to be held in Alexandria, and that he was transported from North Carolina to Alexandria for that purpose. Noel I. Butler, Assistant Commonwealth's Attorney, who interviewed Evans in the Alexandria jail on January 26, 1981, found him cooperative, willing to testify, and able to provide testimony of value on behalf of the Commonwealth. On the following day, however, when Evans was brought into the courtroom to testify, he refused to do so, denied any knowledge of the case, and by his behavior caused the court to recess the proceeding.

Deputy Truesdale removed Evans and two other prisoners, Yvette Boone and Anthony Jasper, from the courthouse to jail in a van. Upon arriving outside the jail, the prisoners proceeded in single file up the steps leading to the jail door, Boone in front, followed by Jasper and then Evans. Jasper's right hand was handcuffed to Evans's left. As Jasper entered the door, Evans began to grapple with Truesdale on the steps. Evans, gaining possession of Truesdale's revolver, shot the officer in the chest from a distance of not more than one-half inch, pointed the weapon at Jasper but did not fire, freed himself by shooting open the handcuffs, and fled on foot. Running through a nearby law office, Evans threatened a secretary with the revolver before continuing his flight. Surrounded by pursuing officers in a nearby parking lot, Evans shot himself, inflicting a superficial wound, and was retaken into custody.

Several inmates of the Alexandria jail were called as witnesses for the  Commonwealth to testify to certain inculpatory statements made by Evans. Before these witnesses testified, Evans objected to any reference they might make to charges pending against him in North Carolina on which he had not been convicted. The court overruled the objection on the ground that such

evidence would be admissible to show Evans's intent or state of mind.

Ralph Washington, an inmate, testified that Evans told him the night before the shooting that he was in Alexandria to testify in a case but that he was not going to say anything, that what he wanted was to "get the hell out." Evans asked Washington about jail security, what court was like, whether the guards carried guns, and whether he could wear civilian clothes to court. He asked another inmate about a good place to run if he escaped. Washington testified that Evans stayed up all night and "was like he was getting ready to go to war." Washington's testimony continued as follows:

> "A. He said he'd already come down; he was already facing life and he ain't got nothing to lose. He said he was going to try any means possible to escape.
> "Q. To what steps would he go?
> "A. Anybody that gets in his way to stop him, he would take him out.
> "Q. Take him out? What does that mean?
> "A. I guess kill them."

At this time the court cautioned the jury as follows:

> "Members of the jury, the statements of the defendant are being admitted into evidence not to show his legal situation in the State of North Carolina, but rather to show his state of mind or intention at the time he made the statements. You should consider those statements only in that respect."

Yvette Boone testified that she was brought from jail in North Carolina to the Alexandria jail to testify as a witness in the same case in which Evans was expected to testify. While they were still in jail in North Carolina, Evans attempted to coach her in preparation for her appearance in court. He also informed Boone that when he went to court he was going "to run." In Alexandria, before Boone testified at the hearing, Evans told her that he had come not to testify but to escape. She, Jasper, and Evans were the prisoners being taken back to jail when Deputy Truesdale was shot. She saw Truesdale and Evans "tussling on the steps," but she was inside the jail door when she heard the shots fired.

Anthony Jasper testified that he occupied the same cell with Evans the night before the shooting, and Evans said that he had come to Alexandria "to try to escape." He asked Jasper the way to run to get to Washington, D. C. "He said he ain't got nothing to lose, you know . . . . He had two life sentences, something like that." The trial court promptly cautioned the jury that these statements were admitted only to show Evans's state of mind when he made the statement and not to prove whether he was facing punishment in North Carolina.

Jasper also testified that he and Evans were handcuffed together on the trip back to jail from the courthouse. Evans asked him whether Truesdale carried a weapon. Jasper had climbed the steps and was entering the jail door when Evans "yanked" him back. He saw Evans and Truesdale struggling over the handgun in Evans's hand. Evans had the gun in the air when Truesdale put his hand on it. Evans said, "Let me go or I'll kill your ass." Then the revolver "came down toward his side and he pulled the trigger." Evans then put the gun to Jasper's head, Jasper protested, and Evans shot the handcuffs off and fled.

Evans, testifying in his own defense, insisted that he had no intent to escape until he saw that Deputy Truesdale was off balance on the jail steps and decided to "run past him." He seized Truesdale's gun to "shoot the handcuffs off." He denied any intention of shooting the officer but asserted that he shot him accidentally while firing at the handcuffs.

Evans concedes that evidence was admissible to show that he planned in North Carolina to escape in Virginia and that, if necessary, he would kill anyone who stood in his way. He argues, however, that the trial court erred in admitting evidence that he was awaiting trial in North Carolina on charges for which he faced one or more life sentences. He relies upon the general rule recently restated in *Moore* v. *Commonwealth,* 222 Va. 72, 76, 278 S.E.2d 822, 824 (1981), that evidence of other offenses is inadmissible to prove guilt of the crime for which the accused is on trial. But this general rule, as we have frequently stated, is subject to numerous exceptions. Thus, evidence of other offenses is admissible to show motive or intent or to negate the possibility of accident. *Id.* at 76, 278 S.E.2d at 824-25. *See Brooks* v. *Commonwealth,* 220 Va. 405, 407, 258 S.E.2d 504, 506 (1979); *Kirkpatrick* v. *Commonwealth,* 211 Va. 269, 272, 176 S.E.2d

802, 805 (1970); *Williams* v. *Commonwealth,* 128 Va. 698, 711-12, 104 S.E. 853, 860-61 (1920).

Here, the trial court exercised commendable caution in twice instructing the jury during the guilt trial that the statements made by Evans in reference to charges pending against him in North Carolina were admitted into evidence solely for the purpose of showing his intent or state of mind. We hold that the statements were properly admitted for that purpose. The jury could reasonably infer that a prisoner held on charges for which he might be sentenced, upon conviction, to imprisonment for life would have a far more compelling motive for attempting to escape by force and violence than one held on charges for which he could receive only a lesser punishment.

We conclude that the trial court committed no error in its conduct of the guilt trial.

### III.   The Sentence Proceeding.

■ At the sentence proceeding which immediately followed the determination of guilt, the Commonwealth presented the testimony of one witness, Officer Louis Pough, of the Alexandria Police Department. Pough testified that he had a conversation with Evans after the Truesdale shooting, and Evans was "concerned about returning to North Carolina on other charges." Evans told Pough that "it mattered not to him who was in his way," that he was from the District of Columbia and he "would try to escape again or be killed at home." Counsel for Evans objected to Pough's testimony about North Carolina charges and moved for a mistrial. The court overruled the motion but cautioned the jury to disregard the reference to "other charges" pending in North Carolina.

The other evidence presented at this proceeding consisted of Commonwealth Exhibits 19, 20, and 21, showing several of Evans's convictions in North Carolina and the sentences imposed thereon as follows:

| | | |
|---|---|---|
| February 21, 1964 | —Breaking, entering and larceny | —6 months |
| July 30, 1964 | —Assaulting a police officer with a knife while the officer was in the performance of his duties | —6 months on road |

| | | |
|---|---|---|
| July 30, 1964 | —Engaging in an affray with a knife | —6 months on road to run consecutively with other sentence of same date |
| September 30, 1964 | —Engaging in an affray with a deadly weapon | —4 months |
| December 15, 1970 | —Asssult & Battery & Assault Inflicting Serious Damage (hitting man in face with his fist, breaking his nose and knocking one tooth out) | —60 days |
| July 12, 1972 | —Escape from North Carolina Prison System | —3 months |
| September 27, 1972 | —Assault with a deadly weapon inflicting serious injuries | —not less than four years nor more than five years |

Included in the jury instructions, all of which were unchallenged on appeal, was Instruction No. 14[4] stating in the alternative what the Commonwealth had to prove before the jury could fix Evans's punishment at death. After retiring to consider its verdict, the jury propounded two questions to the court, first, whether

---

[4] "INSTRUCTION NO. 14
"THE COURT INSTRUCTS THE JURY THAT:
"You have convicted the defendant of an offense which may be punished by death. You must decide whether the defendant shall be sentenced to death or to life imprisonment. Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt at least one of the following two alternatives:
"(1) *That, after consideration of his past criminal record there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society;* or
"(2) That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.
"If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt either of the two alternatives, then you may fix the punishment of the defendant at death.
"If the Commonwealth has failed to prove either alternative beyond a reasonable doubt, then you shall fix the punishment of the defendant at life imprisonment."
(Emphasis added).

Evans's "past criminal record," to which Instruction No. 14 re-
ferred, included all the evidence "offered before and after the ver-
dict," and second, whether Officer Pough's testimony could be
considered as part of Evans's record. The court answered both
questions in the negative and further instructed the jury that the
only evidence of Evans's past criminal record which it could con-
sider was contained in Exhibits 19, 20, and 21. Subsequently, the
jury returned its verdict finding "after consideration of his prior
history that there is a probability that he would commit criminal
acts of violence that would constitute a continuing serious threat
to society," and fixing Evans's punishment at death.

Evans contends that the trial court erred in overruling his mo-
tion for a mistrial made when Officer Pough referred to other
charges pending against Evans in North Carolina. There is no
merit in this contention. The jury was aware that Evans faced
charges in North Carolina because of references thereto properly
admitted in the guilt trial to show his motive or intent. The trial
court, however, expressly directed the jury to disregard the refer-
ence to North Carolina charges in considering the appropriate
punishment to be imposed upon Evans. The court further in-
structed the jury, in answer to its questions, that Evans's past
criminal record was limited to convictions shown in Exhibits 19,
20, and 21 and did not include anything revealed by Officer
Pough's testimony.

We perceive no prejudice to Evans resulting from Pough's testi-
mony, but if there was any prejudice, it was eliminated by the
trial court's decisive corrective action. *See Stamper* v. *Common-
wealth, supra,* 220 Va. at 277, 257 S.E.2d at 820, *Lewis* v. *Com-
monwealth,* 211 Va. 80, 83, 175 S.E.2d 236, 238 (1970). We
hold, therefore, that the trial court did not err in overruling Ev-
ans's motion for a mistrial.

▮▮▮▮ Code § 19.2-264.5[5] authorized the trial court, after con-
sidering the report of the probation officer, "and upon good cause

---

[5] §19.2-264.5. Post sentence reports.—

When the punishment of any person has been fixed at death, the court shall,
before imposing sentence, direct a probation officer of the court to thoroughly inves-
tigate upon the history of the defendant and any and all other relevant facts, to the
end that the court may be fully advised as to whether the sentence of death is
appropriate and just. Reports shall be made, presented and filed as provided in §
19.2-299. After consideration of the report, and upon good cause shown, the court
may set aside the sentence of death and impose a sentence of imprisonment for life.

shown," to commute the death sentence of Evans to imprisonment for life. The report, however, was damaging rather than helpful to Evans. It showed that he had a criminal record more extensive than that introduced into evidence in Exhibits 19, 20, and 21, an unsatisfactory prison record, and an employment history which included acts of violence.

In 1968, a District of Columbia court sentenced Evans to serve a total of 720 days for assault and petit larceny. During his incarceration he received four disciplinary reports, including one for fighting. One former employer in the District of Columbia reported that in 1979 he refused to rehire Evans after Evans had "choked" a waitress during an argument. Several other former employers gave unfavorable reports about his work habits and behavior, but two reported that he was a good worker. His prison records in North Carolina revealed that seven disciplinary reports, one for unauthorized possession of a weapon, were filed against him from February 10, 1973, through September 28, 1975. Other convictions in North Carolina not listed in Exhibits 19, 20, and 21 included one in 1962 for assault with a deadly weapon, with a six months sentence suspended, one in 1965 for assault and battery, disorderly conduct, resisting arrest, and breaking arrest, with a six months sentence, and one in 1967 for assault and battery, with a thirty days sentence.

By order entered June 1, 1981, the trial court sentenced Evans to death in accordance with a jury verdict. Thereafter, Evans filed a motion to set aside the verdict of the jury and grant him a new trial. The trial court overruled the motion. As to the guilt trial, Evans based his motion upon the admission into evidence of the testimony of Washington and Jasper relating his statements about charges pending against him in North Carolina. Having held that this testimony was admissible, we hold that the trial court properly overruled Evans's motion insofar as it was based upon this ground. As to the sentence proceeding, Evans based his motion upon the alleged prejudicial effect of Officer Pough's testimony that Evans referred to the pending North Carolina charges. Having held that the trial court did not err in overruling Evans's motion for a mistrial based upon the same ground, we hold that the court did not abuse its discretion in overruling the post-trial motion insofar as it was based upon this ground.

We conclude that the trial court committed no error in its conduct of the sentence proceeding.

## IV.  Appellate Review of the Death Sentence.

Under the mandate of Code § 17-110.1[6] we review the death sentence imposed upon Evans in the trial court. Evans contends that the sentence should not be affirmed because the evidence is insufficient to show either of the statutory prerequisites to its imposition. He argues that his past criminal record, as presented to the jury, fails to establish that there is a probability that he will commit criminal acts of violence that would constitute a continuing threat to society, and that there is no evidence that his killing of Truesdale was outrageously or wantonly vile, horrible, or inhuman. Therefore, he says, the death sentence is excessive and disproportionate to the penalty imposed in similar cases, and the jury must have been influenced by passion, prejudice, or other arbitrary factors.

The jury based its verdict in the sentence proceeding exclusively upon its finding that Evans had a proclivity for violence that made him a menace to society. Accordingly, we will assume, as the jury indicated by its verdict, that Evans's conduct in killing Truesdale was not outrageously or wantonly vile, horrible or inhuman within the purview of Code § 19.2-264.4C. Therefore, cases cited by Evans, such as *James Dyral Briley* v. *Commonwealth,* 221 Va. 563, 273 S.E.2d 57 (1980), *Linwood Earl Briley* v. *Commonwealth,* 221 Va. 532, 273 S.E.2d 48 (1980), *Turner* v. *Commonwealth,* 221 Va. 513, 273 S.E.2d 36 (1980), *Giarratano* v. *Commonwealth,* 220 Va. 1064, 266 S.E.2d 94 (1980), and *Clark* v. *Commonwealth,* 220 Va. 201, 257 S.E.2d 784 (1979), involving murders of exceptional atrociousness, are inapposite.

In *Stamper* v. *Commonwealth, supra,* the defendant was sentenced to death for each of three capital murders committed during an armed robbery. In two of the murders the jury's verdict

---

[6] Code § 17-110.1 provides in pertinent part:

C. In addition to consideration of any errors in the trial enumerated by appeal, the court shall consider and determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

D. In addition to the review and correction of errors in the trial of the case, with respect to review of the sentence of death, the court may:

1. Affirm the sentence of death; or

2. Commute the sentence of death to imprisonment for life.

fixing punishment at death was based entirely upon the defendant's proclivity for violence. His criminal record showed that he was sentenced in 1972 to serve twenty years in the penitentiary for a 1971 armed robbery and twelve months in jail for unauthorized use of an automobile, and was sentenced in 1974 to six months in jail as an accessory after the fact to an escape from the penal system. He was released on parole in 1976 and committed the triple murders in 1978. A victim of the 1971 armed robbery testified that he was shot by Stamper and permanently disabled during the commission of that crime. We upheld the imposition of the death sentence for each of the three capital murders.

In the present case, Evans had a criminal record extending back to his youth showing a consistent pattern of aggression, bellicosity, and violence. Although only the last conviction presented to the jury, that of September 27, 1972, for assault with a deadly weapon inflicting serious injuries, resulted in imposition of a substantial prison sentence, there were other convictions for offenses in which Evans used a deadly weapon. One of these offenses was assaulting a police officer with a knife while the officer was in the performance of his duties. Another offense was escaping from the North Carolina prison system.

The jury could consider Evans's past criminal record together with the circumstances surrounding the commission of the Truesdale murder in determining whether he would probably commit other crimes of violence. *Smith* v. *Commonwealth, supra,* 219 Va. at 478 and n.4, 248 S.E.2d at 149. There was evidence that Evans came to Virginia with the single-minded purpose to escape, that he planned to kill, if necessary, any person who attempted to prevent his escape, and that, after fatally shooting Truesdale, he reaffirmed his intention to escape even if this meant that he would kill again or be killed. We hold that this evidence, which fitted into the pattern of violent conduct revealed by his past criminal record, was sufficient to support the jury's finding that he would be a continuing threat to society.

In its review of the case, the trial court, of course, had the benefit of a more extensive and detailed record of Evans's past criminal convictions not only in North Carolina but also in the District of Columbia, as well as his prison record and employment history. Thus, the trial court had additional information, not available to the jury, justifying the court's refusal to commute the punishment of death fixed by the jury to imprisonment for life.

■ We find no evidence that the jury verdict and the trial court's review thereof were influenced by passion, prejudice, or any other arbitrary factor. To the contrary, the record reflects careful, conscientious, and objective determinations made successively by jury and trial judge.

We have stated that if juries generally in this jurisdiction impose the death sentence for comparable crimes, then the sentence is not excessive or disproportionate even though a codefendant or another accused may have received a lesser sentence. *Coppola* v. *Commonwealth,* 220 Va. 243, 259, 257 S.E.2d 797, 808 (1979), *cert. denied,* 444 U.S. 1103 (1980), applied in *Stamper* v. *Commonwealth, supra,* 220 Va. at 283, 257 S.E.2d at 824. In *Martin* v. *Commonwealth,* 221 Va. 436, 271 S.E.2d 123 (1980), the only other appeal presented to us in which a defendant was sentenced to death for murdering a police officer in violation of Code § 18.2-31(f), we reversed the conviction and remanded the case for a new trial because of error in selection of the jury. Therefore, we have no comparable cases to consider in determining whether the death sentence imposed upon Evans is excessive or disproportionate.

After carefully considering the record in this case, we hold that the sentence is not excessive or disproportionate. We have no hesitancy in concluding that juries generally in this jurisdiction will impose the death sentence for comparable crimes where inmates who kill prison guards have criminal records showing consistently turbulent, combative conduct and the probability of committing criminal acts of violence that will threaten the peace and security of the law-abiding public.[7] Accordingly, we will affirm the sentence of death.

*Affirmed.*

---

[7] For more than a century prior to enactment of Code § 18.2-31(c) by Acts 1975, chs. 14 and 15, the death sentence was mandatory for an inmate who killed a prison guard. Acts 1843-44, c. 72, and successor statutes. Juries imposed the punishment required under these statutes, *e.g., Ruffin* v. *Commonwealth,* 62 Va. (21 Gratt.) 790 (1871); *Brown* v. *Commonwealth,* 132 Va. 606, 111 S.E. 112 (1922); *Hart* v. *Virginia,* 298 U.S. 34 (1936) (appeal denied by this Court, Supreme Court held there was no substantial federal question); *Jefferson* v. *Commonwealth,* 214 Va. 747, 204 S.E.2d 258 (1974); *Washington* v. *Commonwealth,* 216 Va. 185, 217 S.E.2d 815 (1975); *Lewis* v. *Commonwealth,* 218 Va. 31, 235 S.E.2d 320 (1977).

Until alternative punishment was added by Acts 1914, c. 240, the single sanction in Virginia for murder of the first degree was death. Juries imposed the death sentence both before and after the 1914 amendment for first degree murder of a police officer, *e.g., Davis* v. *Commonwealth,* 89 Va. 132, 15 S.E. 388 (1892); *Gray* v. *Commonwealth,* 150 Va. 571,