## Richmond

ROBERT JAMES HALL, JR.

v.

COMMONWEALTH OF VIRGINIA

No. 1738-90-2

Decided March 10, 1992

66

COUNSEL

John S. Martin (Michael M. Shelton; Dunton, Simmons & Dunton, on briefs), for appellant.

John H. McLees, Jr., Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**WILLIS, J.**—Convicted in a jury trial of second degree murder of his wife, the appellant, Robert James Hall, Jr., contends that the trial court erred (1) in admitting evidence of the attempt by another man to murder that man's wife, (2) in denying his motions to strike the Commonwealth's evidence and to set aside the verdict on the ground that the evidence was insufficient to support his conviction, and (3) in refusing to investigate an allegation of juror misconduct. We find that the trial court erred in receiving evidence of an unrelated crime committed by a third party, and we reverse the appellant's conviction on that ground. We find no merit in the other assignments of error.

About 10:00 p.m. on September 30, 1987, Mr. and Mrs. John Tolbert discovered the appellant's wife, Kay Hall, lying partially

under her pickup truck near the end of Bluff Point Road in Northumberland County. She died shortly thereafter of injuries caused by the truck's having run over and crushed her chest. When the Tolberts came on the scene, the truck's engine was running, its lights were burning and the gear shift was in "park." The front wheels were turned to the right, and extending in front of them were skidmarks which were determined to have been caused by application of the brakes while the vehicle was traveling backwards. Mrs. Hall was lying on her back with her body outside the left front wheel, her legs extending under the front of the vehicle. The left front wheel was wedged between her torso and her right arm, partially on her chest. Marks on her abdomen and bilateral crushing of her chest showed that the left rear wheel had run over her. Her postmortem examination revealed a blood alcohol content of .27% and a vitreous alcohol content of .31%, indicating that she was highly intoxicated but was regaining sobriety.

Earlier in the evening, the Halls had attended a party at Indian Creek Country Club on Bluff Point Road "a couple of miles" from where Mrs. Hall was discovered. They lived on Merry Point in Lancaster County, in the other direction from the Club, a distance requiring twenty-four to twenty-five minutes driving time.

The Halls had traveled together in the pickup truck from their home to the party, arriving at about 7:00 p.m. Both drank heavily. Mrs. Hall was seen leaving the party between 8:00 and 8:15 p.m. Mr. Hall later went to the parking lot to look for his wife and discovered that she and the truck were gone. Mr. and Mrs. Edwin Swannell gave him a ride, arriving at his home between 8:45 and 9:05 p.m. At 9:47 p.m., Hall made a long distance telephone call from his home to his daughter's home in Waldorf, Maryland.

## I.

## EVIDENCE OF AN UNRELATED CRIME COMMITTED BY A THIRD PARTY

Hall's first assignment of error addresses the testimony of Carole Vandergrift. Ms. Vandergrift testified that she and her former husband, William Douglas Carter, had been close friends of the Halls. She testified that on July 31, 1987, while she and Carter were living in Northern Virginia, he shot her in the head. He then drove more rapidly than normal to Saratoga Springs, New York, a trip which normally took eleven hours, and immedi-

ately upon arrival made telephone calls to establish an alibi. She testified that Carter had nonetheless been convicted of attempted murder and was imprisoned.

Hall contends that the evidence of Carter's attempt to murder Ms. Vandergrift was irrelevant to any issue on trial and served only to inflame the jury. He argues that the only conclusion to be drawn from that evidence was that inasmuch as he and Carter were friends, and Carter attempted to murder Ms. Vandergrift, it should be inferred that he murdered Mrs. Hall. The Commonwealth responds that no reasonable mind would conclude that because one man attempted to murder his wife, another would do likewise. It argues that the evidence was relevant because it revealed a method of developing an alibi defense, a method suggested to Hall by its employment by Carter just two months before Mrs. Hall's death. It argues that this shed light on Hall's motive in making the call to his daughter and supports the inference that he thereby constructed a time frame which he invoked in an effort to exonerate himself. We agree with Hall.

■ Evidence of one occurrence may be received to prove another separate occurrence, if it is shown that some logical connection exists between the two, such that the existence of the one makes the existence of the other more probable. *See* C. Friend, *The Law of Evidence in Virginia* § 148 (3d ed. 1988). This rationale embraces evidence of other criminal acts committed either by the accused or by someone else. Thus, upon trial for the murder of a guard during an escape, the Supreme Court upheld the admission of evidence of the accused's statement that "he said he ain't got nothing to lose, you know . . . he had two life sentences, something like that." This was held relevant as evidence of the intent of the accused to escape and to let no one stand in his way. *See Evans v. Commonwealth*, 222 Va. 766, 773, 284 S.E.2d 816, 820 (1981), *cert. denied*, 455 U.S. 1038 (1982). In a case of welfare fraud, where the defense was lack of understanding of the income reporting requirements, evidence of prior convictions of the accused for the same crime was held relevant on the issue of intent. *See Brooks v. Commonwealth*, 220 Va. 405, 407, 258 S.E.2d 504, 506 (1979). Where the accused defended the killing of his wife on the ground of outrage upon discovering her committing adultery, the Supreme Court upheld the admission of evidence that she had been widely known for years to be a common

prostitute, because it supported the inference that the accused must have known of her infidelity and could not have been surprised by it. *See Tillman v. Commonwealth*, 185 Va. 46, 54, 37 S.E.2d 768, 772 (1946).

Hall invoked a time frame which he contended provided him an alibi defense. The call to his daughter was an important element of that time frame. The Commonwealth argues that evidence of Carter's attempt to construct an alibi defense suggests an attempt by Hall to employ the same method. We find this to be mere speculation. Hall must have known that Carter's effort failed. Furthermore, alibi is a commonly employed defense, and the establishment of personal contact is routinely an element of alibi. A challenge to Hall's alibi, the suggestion that he constructed it by the telephone call to his daughter, could have been accomplished without reference to Carter's crime. The principal effect of the description of Carter's crime was to suggest guilt by association. The prejudicial effect of that suggestion far outweighed any probative value that might be found in the suggestion that Hall might have learned from his friend's example.

## II.

### SUFFICIENCY OF THE EVIDENCE

When considering the sufficiency of the evidence on appeal of a criminal conviction, we must view all the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom. . . . The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it.

*Traverso v. Commonwealth*, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988) (citations omitted). The evidence in this case is largely circumstantial. However,

[t]he law in Virginia is clear that circumstantial evidence is as competent and entitled to the same weight as direct testimony, provided that it is of such convincing character as to exclude every reasonable hypothesis other than that the accused is guilty.

*Johnson v. Commonwealth*, 2 Va. App. 598, 604, 347 S.E.2d 163, 167 (1986).

When Mr. and Mrs. Tolbert came on the scene, the left front wheel of the truck was partially on Mrs. Hall's chest, and the gear shift was in the "park" position. Mr. Tolbert pulled the gear shift into the "neutral" position, and the truck rolled forward a few inches off of Mrs. Hall's chest. Extending forward from the front wheels of the truck were skidmarks which were determined to have resulted from the application of the brakes while the truck was moving backward at a moderate speed. This evidence supported the finding that some other person applied the brakes and put the vehicle in "park" after it had run over Mrs. Hall. The evidence described the performance of experiments which negated the possibility that Mrs. Hall could have suffered her injuries because of the truck's slipping from "park" into "reverse." These experiments determined that her body would not have stopped the truck under those circumstances. She, in her injured condition, could not have returned the gear shift lever to "park" and then placed herself under the left front wheel.

Mr. and Mrs. Hall were married in 1985. The marriage had been "rocky." They had experienced financial difficulties. Mr. Hall declared bankruptcy. His interest in their home was sold to satisfy a tax lien and was purchased at the sale by Mrs. Hall. Mrs. Hall had exhausted the assets of the retirement fund that she had developed in her employment prior to their marriage.

The marriage had experienced physical violence. On numerous occasions, Mrs. Hall had displayed bruises and black eyes. She had expressed fear of her husband and had spoken of divorce as recently as August 1987. A witness testified that on the day of her death Mrs. Hall had come to her shop looking "god awful," crying, and telling how much she was afraid of her husband.

There was testimony that Mrs. Hall had substantial financial assets. She owned the marital home in Lancaster County and a home in the District of Columbia having an equity of approximately $46,000. She and her brother were the beneficiaries of her father's estate, which had an estimated value of $330,000. There was testimony that Mr. Hall would inherit his wife's property.

The evidence disclosed that the driving time from the Hall home to the end of Bluff Point Road, where Mrs. Hall was found, was twenty-one to twenty-two minutes. Hall arrived home from the Indian Creek Country Club as early as 8:45 p.m. He tele-

phoned his daughter at 9:47 p.m. Calculations conceded by Hall to be correct demonstrate that within that time frame is a period of twenty-one minutes during which he could have located his wife and killed her. He argues, however, that it is not reasonable to conclude that he could have accomplished this.

Hall questions in argument how he could have known where to find his wife. This is a question which is neither asked nor answered in the evidence. He had lived earlier in the Bluff Point area, and perhaps he had taken Mrs. Hall there. A right turn rather than a left at the Club entrance would have taken Mrs. Hall to Bluff Point. He may have arranged to meet her there, or he may have supposed that since it was close to the Club, it would be a good place to begin looking for her. The fact remains that, whatever circumstances may have contributed to the effort, he had time to find her.

Between 1:00 a.m. and 1:30 a.m. on October 1, Trooper Davis went to Hall's home. Davis told Hall that his wife had been killed in an accident, but did not tell him how she had died. At 2:08 a.m. on October 1, Investigator David Riley went to the Hall home. Hall told Riley that a truck had rolled over his wife, a detail that Davis had not told Hall. Hall first told the officers that he and his wife had argued in the parking lot before she left the Club. He later retracted this, saying that before going to the party they had argued about which vehicle to drive. Hall gave the police conflicting accounts of what he had done after returning home from the Club. He first denied that he had left home. When confronted with the fact that the engine of his jeep was warm, he said that he had driven to the end of his lane and back. He then acknowledged driving as far as Route 3 and back. Later, confronted with the suggestion that someone had seen him in Kilmarnock, he stated that he had driven to Lancaster Courthouse out of concern that his wife might have been arrested for driving while intoxicated, but not seeing her truck in the courthouse parking lot, had returned home.

Riley informed Hall that his investigation led him to believe that the death had been an accident. He discussed with Hall what might be done to induce the person involved to come forward.

On December 13, 1988, Hall called Riley, stating that he "wanted a Christmas present from [Riley]." He said that "he

wanted this case solved by Christmas because he was in love with someone else and needed to have some things resolved before he could go forward in this relationship." He met with Riley on December 21. He first attempted to persuade Riley that John Tolbert had accidentally run over Mrs. Hall, but when Riley rejected this suggestion, Hall admitted that it was unlikely.

Riley then told Hall that he was the only logical suspect. He reiterated that he thought that it was probably an accident. He suggested that the person driving the truck had applied the brakes when he felt the rear wheel bump over Mrs. Hall's body. Hall interjected, "Or she screamed."

Hall suggested that the killer might come forward if he were at no risk, if the newspaper reported that the death had been accidental, and the killer were immunized from any civil or criminal risk. Hall and Riley discussed changing the death certificate to indicate accidental death. The discussion then went forward as to what Hall would insist upon to come forward, if he were the killer. Hall suggested a legal document from the Commonwealth's Attorney declaring Mrs. Hall's death an accident and that there would be no adverse consequences to the killer's assets, home or insurance, that there would be no publicity, and that no charges would be placed. Riley asked, "[I]f I went out and got such a document, put Bob Hall's name on it, then would you like to see it?" Hall responded, "[B]efore Christmas." Hall then remarked, "The only problem I perceive is that you've got the wrong person. But maybe you don't, David. The only key to it is nobody saw. . . . But there is only one problem. One problem. The person that did that would have gotten away with it. And you know something, Dave?. . . They'll do it again." Later in the conversation, Hall told Riley that if Riley "really wanted to make it tempting as hell to me," he should call Hall's attorney to inquire if Hall could still collect under the uninsured motorist provisions of his automobile insurance if he had accidentally killed his wife.

Riley then began to write out the conditions that he and Hall had agreed upon. These included: no criminal action against Hall; no jeopardy to his driver's license; forgiveness of some fines; he would not be identified as living in Merry Point, Virginia; his social security number would not be mentioned; and he would not lose any property rights, claims to Mrs. Hall's estate, or insurance settlements as a result of the agreement. Hall then suggested to

Riley an additional provision. He proposed to burn his house down and to use the insurance to build a new one on the site for his new lady friend. Riley said that he could not put that into the document because it was a crime, and he was taking the document seriously. Hall responded that he was "taking it damn dead seriously." Hall stated, "I bet I could do it in such a way they'll say it was an accident, just like we're doing in this. No difference."

The foregoing evidence abundantly supports the finding that Mrs. Hall's death resulted from criminal agency, that Mr. Hall had the opportunity and motive to kill her, and that he admitted to Investigator Riley that he had killed her, and sufficiently supports the jury's verdict.

## III.

## JUROR MISCONDUCT

On July 24, 1990, four days after the verdict had been received, Hall's counsel presented to the trial court the affidavit of Alexandra K. Stamm, reporting in essential part:

On Friday, July 20, 1990 Affiant had a conversation with a woman (name unknown) in front of the courthouse in Heathsville. During the conversation, this woman stated that she had a friend on the jury in the Robert Hall trial. Her friend's last name was Stewart and she sat on the far right hand side of the jury box. The woman stated to Affiant that Ms. Stewart came to her house every morning at 7:30 in the morning each day of trial to tell her everything that was happening in the trial and also to complain about having to be on the jury. The woman told Affiant that Ms. Stewart said that Robert Hall "would get off because they don't have anything on him" or words to that effect.

The woman also told Affiant and one of Robert Hall's daughters that Ms. Stewart had discussed that the daughter had testified the day before.

The trial court denied Hall's motion that the juror Stewart be returned for inquiry as to whether the jury's deliberations had been thus tainted. Relying on *Brittle v. Commonwealth*, 222 Va. 518, 281 S.E.2d 889 (1981), Hall contends that the trial court was obliged to return the juror for inquiry if there was any showing

that the jury *might* have been prejudiced. That rule is inapplicable here. *Brittle* applies to test harmlessness upon a showing that extraneous information has been injected into jury deliberations.

■ In *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 361 S.E.2d 436 (1987), we said:

> [W]hen the information disclosed in the juror's affidavit indicates that injustice probably occurred, the trial court has the affirmative duty to further investigate whether juror misconduct occurred.

*Id.* at 207, 361 S.E.2d at 447. In *Kearns v. Hall*, 197 Va. 736, 91 S.E.2d 648 (1956), the Supreme Court said:

> When allegations of the misconduct of a juror are of such a nature as to indicate that the verdict was affected thereby, it becomes the duty of the court to investigate the charges and to ascertain whether or not, as a matter of fact, the jury was guilty of such misconduct.

*Id.* at 743, 91 S.E.2d at 653.

The affidavit of Ms. Stamm contained no suggestion that extraneous information was injected into the jury deliberations. It suggested no information given to juror Stewart other than what she heard in the courtroom. It suggested no misconduct by juror Stewart, by the jury, or by anyone with respect to them. The trial court correctly ruled that the affidavit did not require that the jury be summoned for inquiry.

The judgment of the trial court is reversed and this case is remanded for retrial if the Commonwealth be so advised.

*Reversed and remanded.*

Bray, J., concurred.

Benton, J., concurring in part and dissenting in part.

Because evidence of an unrelated crime committed by a third person was inadmissible, I agree that we must reverse the conviction. Accordingly, I concur in Part I of the opinion. I also concur in Part III of the opinion.

I do not join in Part II of the opinion. I would reverse the conviction and dismiss the prosecution because the evidence failed to prove beyond a reasonable doubt that Robert B. Hall, Jr. killed his wife.

> [I]f the proof relied upon by the Commonwealth is wholly circumstantial, as it here is, then to establish guilt beyond a reasonable doubt all necessary circumstances proved must be consistent with guilt and inconsistent with innocence. They must overcome the presumption of innocence and exclude all reasonable conclusions inconsistent with that of guilt. To accomplish that, the chain of necessary circumstances must be unbroken and the evidence as a whole must satisfy the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty.

*LaPrade v. Commonwealth*, 191 Va. 410, 418, 61 S.E.2d 313, 316 (1950).

Through reconstruction evidence, the Commonwealth attempted to prove that Hall's wife was killed through criminal means rather than accidentally and that Hall killed his wife. Even accepting the Commonwealth's hypothesis that her death was not accidental, no evidence proved that Hall knew where his wife had driven the truck when she left the country club or that Hall was at the place where she died that night. Indeed, a witness for the Commonwealth testified that on the evening in question, more than forty-five minutes after Hall's wife left the country club, only one vehicle passed her house travelling toward the end of the country road. That vehicle was a truck resembling the one driven by Hall's wife. She saw no other vehicles pass her house until several police vehicles came.

On brief, the Commonwealth speculates that Hall "was surprised to find that his wife was not home," drove his jeep into the night looking for her, and found her on the dead end road in the next county "on the supposition that his inebriated wife may have turned in the wrong direction and lost her way." That hypothesis is pure speculation. By suggesting to the jury that the distance (from the country club, to Hall's home, to the place where his wife died, and then back to Hall's home) theoretically could be traversed in the interval between the time Hall was driven from

the country club and the time he placed a telephone call to his daughter, the Commonwealth sought to have the jury also speculate that Hall in fact found his wife, passed the witnesses' house without detection, murdered his wife, and returned home. The evidence does not prove that hypothesis. Nor does the evidence disprove that, even if Hall's wife was murdered, she was not killed by some other person who saw her stopped by the roadway or to whom she gave a ride.

> Whenever the evidence leaves indifferent which of several hypotheses is true, or merely establishes only some finite probability in favor of one hypothesis, such evidence does not amount to proof of guilt beyond a reasonable doubt.

*Sutphin v. Commonwealth*, 1 Va. App. 241, 248, 337 S.E.2d 897, 900 (1985) (citation omitted).

The majority asserts that Hall admitted killing his wife. No evidence in this record supports that assertion. Indeed, the Commonwealth does not even suggest that Hall admitted killing his wife. This is purely a case based on insufficient circumstantial evidence and suspicion.

> But, circumstances of suspicion, no matter how grave or strong, are not proof of guilt sufficient to support a verdict of guilty. The actual commission of the crime by the accused must be shown by evidence beyond a reasonable doubt to sustain his conviction.

*Clodfelter v. Commonwealth*, 218 Va. 619, 623, 238 S.E.2d 820, 822 (1977) (citation omitted).

For these reasons, I would reverse the conviction and dismiss the indictment.