COURT OF APPEALS OF VIRGINIA

Present: Judges Kelsey, Petty and Senior Judge Bumgardner
Argued at Richmond, Virginia


MICHAEL J. COUTURE

OPINION BY
v.      Record No. 3153-06-2                    JUDGE D. ARTHUR KELSEY
                                                FEBRUARY 12, 2008
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Walter W. Stout, III, Judge

G. Russell Stone, Jr. (D. Gregory Carr; Bowen, Champlin, Carr,
Foreman & Rockecharlie, on brief), for appellee.

Robert H. Anderson, III, Senior Assistant Attorney General
(Robert F. McDonnell, Attorney General, on brief), for appellant.


A jury convicted Michael Couture of voluntary manslaughter for the fatal shooting of

Santanna Olavarria. On appeal, Couture argues the trial court prejudiced his defense by

incorrectly answering a question from the jury during deliberations. Couture also challenges the

sufficiency of the evidence to support his conviction. Rejecting both arguments, we affirm.

I.

On appeal, we review the evidence in the "light most favorable" to the Commonwealth.

Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003). Viewing the record

through this evidentiary prism requires us to "discard the evidence of the accused in conflict with

that of the Commonwealth, and regard as true all the credible evidence favorable to the

Commonwealth and all fair inferences to be drawn therefrom." Parks v. Commonwealth, 221

Va. 492, 498, 270 S.E.2d 755, 759 (1980) (emphasis and citation omitted).

One evening in May 2004, Couture, a police officer, and his partner, Officer Edward

Aeschlimann, were patrolling an area of Richmond when they observed a vehicle illegally drive

through a stop sign. Traveling in a marked police cruiser, the officers activated their emergency lights and stopped the vehicle. When the driver, Santanna Olavarria, opened the driver's side door and leaned out, the officers directed him to get back inside the vehicle.

As the officers approached the vehicle, one on each side, they saw Olavarria extend his right hand beneath his knees under the seat. He was the only occupant of the vehicle. Both officers feared Olavarria might be armed. Complying with an order from Couture, Olavarria put his hands on the steering wheel. Couture asked Olavarria for his license and registration. Olavarria appeared nervous. When Aeschlimann got to the passenger's side window, he saw a few inches of the barrel of a pistol under Olavarria's seat. Aeschlimann told Couture to "get him out" three times. Couture interpreted his partner's warnings to suggest Olavarria was armed.

With the driver's side door still partially opened, Couture reached into the car and used an "arm bar" technique to acquire physical control over Olavarria. Couture ordered Olavarria out of the vehicle. Olavarria attempted to step out of the driver's side door, but his seatbelt restrained him. As Couture reached over to unbuckle the seatbelt, Olavarria grabbed Couture's shirt, and the vehicle started to move forward. Couture ordered Olavarria to stop the vehicle. Couture tried to run with the car while attempting to obtain control over Olavarria but lost his footing and fell into the vehicle on top of Olavarria. Panicked by his vulnerable situation, Couture testified, "I decided that I was going to use lethal force to end this without me possibly losing my life or someone else's life." Couture then drew his service firearm. Just as Olavarria raised his hands and said, "don't," Couture shot him.

Fearing that Olavarria had shot his partner, Aeschlimann fired into the vehicle as he ran behind it. One of the rounds hit Couture in the leg. After the vehicle came to a complete stop, Couture crawled out of the passenger's side window. Investigators later found a firearm

underneath the driver's seat in the place Aeschlimann had noticed it. Olavarria was dead, slumped over the steering wheel.

Couture was charged with voluntary manslaughter punishable under Code § 18.2-35. At trial, Couture's counsel told the jury the evidence would support the conclusion that the killing of Olavarria was a "justifiable homicide" under the circumstances. Couture took the witness stand asserting that he fired in self-defense. He admitted, however, that he never saw any weapon in the vehicle and recalled Olavarria's raised hands as he pulled the trigger.

After the presentation of evidence, the parties agreed on a jury instruction defining voluntary manslaughter as proof beyond a reasonable doubt that Couture killed Olavarria as a "result of an intentional act" and "while in the sudden heat of passion upon reasonable provocation or in mutual combat." The parties similarly agreed to an instruction, labeled Instruction No. 9, defining the boundaries of a police officer's privilege to use deadly force:

> You are instructed that when a police officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to that officer or others, it is legally permissible to use deadly force to prevent harm to one's self or others and to prevent escape.

> However, the amount of force used to defend oneself and prevent escape must not be excessive and must be reasonable in relation to the perceived threat. The use of deadly force is an act of necessity and the necessity must be shown to exist or there must be shown such reasonable apprehension of imminent danger, by some overt act, as to amount to the creation of necessity. The right to kill in self-defense begins when the necessity begins and ends when the necessity ends.

> In this context, "imminent danger" is defined as an immediate and perceived threat to one's safety or the safety of others.[1]

> A defendant must reasonably fear death or serious bodily harm to himself at the hands of his victim. It is not essential that the danger should in fact exist. If it reasonably appears to a defendant that the danger exists, he has the right to defend himself against it to the same

_____

[1] With consent of the parties, the trial court modified this sentence of the instruction in response to a question from the jury. The phrase "immediate, real threat" was changed to "immediate and perceived threat."

- 3 -

extent, and upon the same rules, as would obtain in case the danger is real. A defendant may always act upon reasonable appearance of danger, and whether the danger is reasonably apparent is always to be determined from the viewpoint of the defendant at the time he acted.

Couture's counsel, however, objected to the prosecutor's proposed instruction on self-defense which stated: "If a defendant is even slightly at fault at creating the difficulty leading to the necessity to kill, the killing is not judged justifiable homicide. Any form of conduct by the defendant from which the jury may reasonably infer that the defendant contributed to the affray constitutes fault." Couture's counsel argued that this proposed instruction misstated the law applicable to police officers. The trial court agreed and rejected the proposed at-fault instruction.

During closing arguments, both the prosecutor and Couture's counsel addressed whether Couture's use of deadly force in self-defense satisfied the requirements of Instruction No. 9. Neither discussed whether any specific showing of fault would categorically disentitle Couture from the privilege to use deadly force if the circumstances otherwise warranted it.

While deliberating, the jury presented several questions to the court, including: "Does self defense still apply if the officer is largely responsible for creating the perception of danger?" Couture's counsel argued that the court should answer simply, "Yes." In response, the trial court suggested the answer to the jury's question could be found "in the instructions as they exist." Couture's counsel objected. Anything less than an unqualified "yes," he argued, would be "inadequate and nonresponsive." The trial court disagreed and advised the jury that the "instructions of law have been given [to] you, and they should be sufficient for you to determine the issue that you have raised."

The jury found Couture guilty of voluntary manslaughter and recommended that he be fined $2,500 without incarceration. Couture filed a motion to set aside the verdict, asserting again that the trial court's response to the jury's question was incomplete and inaccurate. The trial court denied the motion and entered final judgment.

II.

## A. THE SELF-DEFENSE JURY QUESTION

On appeal, Couture repeats his objection to the trial court's response to the jury's question. He does not challenge the accuracy of the jury instructions generally and concedes they adequately covered all the issues either he or the prosecutor intended to present to the jury. Even so, Couture argues, the jury introduced a new concept into the case with its question: "Does self defense still apply if the officer is largely responsible for creating the perception of danger?" The trial court's only proper response, Couture concluded, was to answer with an unqualified "yes."

We find Couture's argument unpersuasive at several levels. To begin with, even if the question should have been answered at all, the trial court could not have answered with an unqualified "yes." At best, the correct answer would have been, "It depends." Instruction No. 9 made clear that Couture could not use deadly force to defend himself if it amounted to "excessive" force not "reasonable in relation to the perceived threat." To the extent his responsibility for "creating the perception of danger," as the jury put it, rendered his perception unreasonable or his use of force excessive, then the privilege to defend himself with deadly force would not be available. On the other hand, if Couture's responsibility for creating the perception of danger did not undermine the reasonableness of his use of force or of his apprehension of danger, then the answer would be, "Yes." In either case, the "yes" or "no" answer depended entirely on the boundaries set by Instruction No. 9 for a police officer's privilege to use deadly force.

Consequently, the trial court correctly avoided giving an unqualified "yes" answer to the jury's question. Instead, the court told the jury to answer its own question by looking at the instructions of law already given. Instruction No. 9 set out the limits of an officer's privilege to

use deadly force and never suggested the privilege was extinguished simply by showing that the officer was "largely responsible" for getting himself in a position of peril. Both the officer's apprehension of the perceived danger and his response to it turned solely on a reasonableness standard. "It is entirely proper for the court to refer the jury back to the court's original charge," United States v. Barsanti, 943 F.2d 428, 438 (4th Cir. 1991), when it accurately and completely marks off the jury's decisional boundaries.

Couture nonetheless fears the jury's question implies the belief that a defendant at fault for creating the danger must "retreat to the wall," Appellant's Br. at 12, 14-15, before exercising deadly force in self-defense. "The notion that a person at fault must retreat to the wall," Couture correctly points out, "had not been placed before the jury because it did not apply to the facts of the case." Id. at 15. The trial court's response to the jury's question, Couture argues, permitted the jury to raise a new issue and then decide it against him. Had the trial court been more direct with its response, he concludes, that result could have been avoided. Two considerations persuade us otherwise.

First, we presume juries follow the instructions of the trial court. See Muhammad v. Commonwealth, 269 Va. 451, 524, 619 S.E.2d 16, 58 (2005); Seaton v. Commonwealth, 42 Va. App. 739, 750, 595 S.E.2d 9, 14 (2004). When the court directed the jurors to find the answer to their question by consulting the other instructions, we trust that they set aside any concerns they may have had about Couture's fault to the extent they were not relevant to determining the reasonableness of his apprehension of danger and his use of force — limiting concepts explained in considerable detail in Instruction No. 9.

Second, we reject Couture's assumption that the basis for the jury's ultimate decision can be inferred from questions asked during the deliberative process. As we recently explained: "A jury speaks only through its unanimous verdict. 'The verdict, as finally agreed upon and

pronounced in court by the jurors, must be taken as the sole embodiment of the jury's act.'" Kennemore v. Commonwealth, 50 Va. App. 703, 709, 653 S.E.2d 606, 609 (2007) (citation omitted). "In Virginia, as elsewhere, the deliberations of jurors 'during retirement, their expressions, arguments, motives, and beliefs, represent that state of mind which must precede every legal act and *is in itself of no jural consequence*.'" Id. (quoting 8 Wigmore, Evidence § 2348, at 680 (McNaughton rev. 1961) (emphasis added)). "A question posed to the court during deliberations, after all, could suggest as little as the tentative views of a single juror." Id.

For these reasons, neither the jury's question nor its ultimate verdict shakes our confidence in the jurors' presumed obedience to the trial court's directive to resolve all issues in the case (including the one they brought up entirely on their own) solely on the basis of the instructions of law already given. The trial court, therefore, did not err in answering the jury's question by referring the jury to the previously given instructions rather than answering the question with an unqualified "yes," as Couture requested.

### B. Sufficiency of the Evidence

Couture also argues the evidence is too weak to support the voluntary manslaughter verdict. We disagree.

When a jury decides the case, Code § 8.01-680 requires that "we review the jury's decision to see if reasonable jurors could have made the choices that the jury did make. We let the decision stand unless we conclude no rational juror could have reached that decision." Pease v. Commonwealth, 39 Va. App. 342, 355, 573 S.E.2d 272, 278 (2002) (*en banc*), aff'd, 266 Va. 397, 588 S.E.2d 149 (2003). A reviewing court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original and citation omitted).

We must instead ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (quoting Jackson, 443 U.S. at 319 (emphasis in original)). Because an appellate court is "not permitted to reweigh the evidence," Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), when "there is evidence to support the conviction, an appellate court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion." Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998).

In this case, the jury found Couture guilty of voluntary manslaughter. In Virginia, "manslaughter is a common law offense." Blythe v. Commonwealth, 222 Va. 722, 725, 284 S.E.2d 796, 797 (1981). Common law defined manslaughter as the "unlawful killing of another" without malice. 4 William Blackstone, Commentaries on the Laws of England ch. 14, at 191 (1769). "Voluntary manslaughter may be found upon evidence that an intentional, non-malicious homicide occurred in sudden mutual combat or as a result of heat of passion induced by reasonable provocation. This is the customary language of the Virginia cases from early times." John L. Costello, Virginia Criminal Law & Procedure § 3.6-1, at 64-65 (3d ed. 2002). Unlike murder, which requires malice, voluntary manslaughter arises not out of "malignity of heart" but from a lack of self-control "imputable to human infirmity." Willis v. Commonwealth, 37 Va. App. 224, 231, 556 S.E.2d 60, 64 (2001) (quoting Hannah v. Commonwealth, 153 Va. 863, 870, 149 S.E. 419, 421 (1929)).

The *furor brevis* of voluntary manslaughter can include "fear" of harm as well as rage. McClung v. Commonwealth, 215 Va. 654, 657, 212 S.E.2d 290, 292 (1975). As Professor Bacigal explains: "Fear is another emotion that can reduce what would otherwise be murder to voluntary manslaughter. If fear was adequately and in fact provoked, but is insufficient for self

defense, the resultant killing is voluntary manslaughter." Ronald J. Bacigal, <u>Criminal Offenses</u> <u>& Defenses in Virginia</u> 358 (2007-08 ed.). "Thus it seems the fearful killer is a manslaughterer when his fear is produced by facts insufficient to make him a self-defender, *e.g.*, the deadly response was unnecessary or the fear was unreasonable." <u>Id.</u> at 358-59.[2]

Applying that distinction in the context of a police officer's use of deadly force, Instruction No. 9 explained that criminal culpability for manslaughter ended where the exoneration of self-defense began. Couture was entitled to use deadly force to protect himself, the instruction made clear, but only if the "amount of force" was not excessive and was "reasonable in relation to the perceived threat." As the instruction stated:

> The use of deadly force is an act of necessity and the necessity must be shown to exist or there must be shown such reasonable apprehension of imminent danger, by some overt act, as to amount to the creation of necessity. The right to kill in self-defense begins when the necessity begins and ends when the necessity ends.
>
> In this context, "imminent danger" is defined as an immediate and perceived threat to one's safety or the safety of others.

Instruction No. 9 rests on the settled proposition that a police officer "cannot kill unless there is a necessity for it, and the jury must determine upon the testimony the existence or absence of the necessity. They must judge of the reasonableness of the grounds upon which the officer acted." <u>Hendricks v. Commonwealth</u>, 163 Va. 1102, 1109, 178 S.E. 8, 11 (1935). "The law does not clothe him with authority to judge arbitrarily of the necessity. He cannot kill, except in case of actual necessity, and whether or not such necessity exists is a question for the jury." <u>Id.</u> at 1110, 178 S.E. at 11 (citations omitted).

---

[2] Some courts and commentators refer to this principle as "imperfect self-defense" because it includes situations where "the defendant is entitled to self-defense under the facts, but in defending himself uses greater force than is reasonably necessary for his protection and kills his opponent." Roy Moreland, <u>The Law of Homicide</u> 93 (1952). "Another instance of imperfect self-defense is found in the situation where the accused kills because he thinks his life is in danger but his belief is an unreasonable one." <u>Id.</u>

Accepting Instruction No. 9 as the law of the case,[3] we conclude a rational jury could have found Couture — while motivated, no doubt, by non-malicious fear — nonetheless used deadly force disproportionate to any reasonable apprehension of harm. Olavarria did not confront Couture with a weapon or appear to be trying to do so. Olavarria was shot while saying "don't" with both hands raised. The circumstances of the stop, moreover, did not involve a suspect either officer knew or reasonably suspected to be a violent criminal. The jury could have rationally concluded that, while understandably frightening, the movement of the vehicle and Couture's attempt to stop it produced an insufficiently grave risk of harm to warrant the use of deadly force.

In short, the right to use deadly force in self-defense "begins where the necessity begins and ends where it ends." Thomason v. Commonwealth, 178 Va. 489, 498, 17 S.E.2d 374, 378 (1941) (citations omitted). Because the question of necessity "is pre-eminently a question of fact and therefore a question for the jury," Hendricks, 163 Va. at 1110, 178 S.E. at 11, we have no authority to set aside the decision of the jury in this case.

III.

Finding no error in the trial court's response to the jury's question and no insufficiency of evidence to support the verdict, we affirm Couture's conviction for voluntary manslaughter.

Affirmed.

---

[3] Because jury instructions "given without objection" become the "law of the case," Spencer v. Commonwealth, 240 Va. 78, 89, 393 S.E.2d 609, 616 (1990), and Couture raises no challenge to Instruction No. 9 on appeal, we assume *arguendo* — but do not hold — that Instruction No. 9 accurately states the law governing a police officer's privilege to use deadly force.