COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, Decker and O'Brien
Argued at Norfolk, Virginia

UNPUBLISHED

STEPHEN D. RANKIN

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1671-16-1                      JUDGE MARLA GRAFF DECKER
                                                    APRIL 24, 2018
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Johnny E. Morrison, Judge

James O. Broccoletti (Randall J. Leeman, Jr.; Nicole A. Belote;
Zoby, Broccoletti & Normile, P.C.; Kozak, Davis, Renninger &
Belote, P.C., on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Stephen D. Rankin appeals his conviction for voluntary manslaughter.  He argues that the

trial court erred by not allowing his witness to testify as an expert.  The appellant also argues that

the trial court erred by denying his motion for a mistrial based on juror contact with a courtroom

observer and not conducting additional investigation into the alleged misconduct.  For the

reasons that follow, we affirm the conviction.

I.  BACKGROUND

The appellant, who was a Portsmouth police officer at the time of the offense, was

charged with first-degree murder and the use of a firearm in the commission of a felony.  At trial,

the Commonwealth presented evidence that in response to a call regarding a suspected

shoplifting incident, the appellant attempted to detain William Chapman (the victim), the

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

purported shoplifter, in a parking lot. The pair struggled, and the appellant deployed his Taser. Despite the appellant's use of his Taser, the victim continued to resist.[1] The appellant then drew his firearm and ordered the victim to get on the ground. He responded by making a quick and aggressive gesture toward the appellant, who fired his gun twice, hitting the victim's chest and head. The victim died from his wounds.

The jury found the appellant guilty of voluntary manslaughter and not guilty of the use of a firearm offense. The trial court fixed the sentence at two and one-half years in prison, as recommended by the jury, and imposed an additional post-release "term" of one year, which it suspended.

## II. ANALYSIS

The appellant raises two distinct assignments of error. He argues that the trial court erred by not allowing a criminal justice professor to testify as an expert on the subject of use of force by police officers. He also contends that the trial court erred by denying his motion for a mistrial based on contact between a juror and a courtroom observer and not further investigating that contact.

### A. Defense Witness Proffered Testimony

The appellant suggests that the trial court erred by refusing to allow his witness, Professor Michael Lyman of Columbia College in Missouri, to testify as an expert on the subject of police use of force. He argues that the trial court misapplied the law by excluding the witness' testimony in part because he had not previously testified in Virginia. The appellant also

---

[1] The appellant testified that the victim knocked the Taser out of his hand. An eyewitness described the victim's reaction to being hit with the Taser as "put[ting] his hand up like he was about to fight."

contends that the trial court erred in excluding Lyman's expert testimony even though he had sufficient knowledge and experience to qualify as an expert.[2]

### 1. Basis for Trial Court's Ruling

The appellant argues that the court erroneously held that Lyman did not qualify as an expert witness due to his lack of previous experience testifying in Virginia. See generally Va. R. Evid. 2:702(a)(i), (ii) (explaining in part that a witness may "qualif[y] as an expert by knowledge, skill, experience, training, or education"). This conclusion is not supported by the record when viewed in its entirety.

The trial court ruled that Lyman could not testify as an expert and then commented, "[P]lus he's never testified as an expert in Virginia on this issue." When the prosecutor stated, "I don't think he's ever testified," the trial judge responded, "That's not the issue." The court also noted that the proffered testimony was "getting kind of close to the ultimate" issue of fact to "be decided by the jury." When the appellant raised the issue of Lyman's expert testimony again, the trial court confirmed its earlier ruling, stating, "[I]t was my decision that I thought it would invade the province of the jury with respect to the ultimate issue, and also he had never qualified as an expert in the State of Virginia. That's not required, but whether or not one is an expert is within the discretion of the Court . . . ."

---

[2] The Commonwealth contends that the appellant did not preserve certain matters for appeal pursuant to Rule 5A:18 by not proffering them until after the case was submitted to the jury. See generally Va. R. Evid. 2:103(a)(2) (requiring the proponent of excluded evidence to make "the substance of the evidence . . . known to the court by proffer"); Creamer v. Commonwealth, 64 Va. App. 185, 195-96, 767 S.E.2d 226, 231 (2015) (noting that Rule 5A:18 requires a party to contemporaneously make clear the bases upon which he contends offered evidence should be admitted in order to preserve an issue for appeal). For purposes of this appeal, we assume without deciding that the appellant's first proffer encompassed the more specific points made in his later proffer and consequently that the appellant is not procedurally barred from relying on the entirety of Lyman's proffered testimony. See Dunham v. Commonwealth, 59 Va. App. 634, 638, 721 S.E.2d 824, 826 (assuming without deciding that Rule 5A:18 did not bar the assignment of error), aff'd per curiam, 284 Va. 511, 513, 733 S.E.2d 660, 661 (2012).

"Absent clear evidence to the contrary," we presume that the trial court knew the law and properly applied it. Yarborough v. Commonwealth, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977). In addition, the comments by the judge cannot be viewed in a vacuum. Id. (holding that a reviewing court "will not fix upon isolated statements of the trial judge taken out of the full context in which they were made[] and use them as a predicate for holding the law has been misapplied").

Viewing the trial court's ruling and comments in context and taking into account the entire discussion, the record supports the conclusion that the judge properly applied the law. The court made clear that it did not exclude Lyman from testifying as an expert witness on the basis of his lack of previous experience testifying in a Virginia court. When the prosecutor commented in the argument opposing Lyman's admission as an expert witness, "I don't think he's ever testified," the trial judge responded, "That's not the issue." Further, the court later acknowledged its understanding of the rule relating to expert qualification and stated that it was "not required" that Lyman had previously qualified as an expert in the Commonwealth. The court then correctly concluded that the decision was a matter of its discretion. A reading of the record as a whole simply does not support the appellant's claim that the court prohibited the witness from testifying as an expert because he had not done so before in Virginia.

2. Admissibility of Testimony

The appellant argues that the trial court erred by not allowing Lyman to opine on whether the appellant's conduct "was consistent with well-established and widely-adopted police training and policies concerning use of force" as well as with the Portsmouth Police Department use of force policy itself. Further, he unsuccessfully sought to have Lyman testify about certain types of accepted police training. He contends that Lyman's testimony would have given the jury context for both his actions and the Portsmouth Police Department's use of force guidelines.

Whether to admit expert testimony is a decision within the sound discretion of the trial court.[3]  See Currie v. Commonwealth, 30 Va. App. 58, 64, 515 S.E.2d 335, 338 (1999).  An appellate court will reverse that determination to admit or exclude expert testimony only if the trial court abused its discretion under the particular circumstances of the case.  E.g., Atkins v. Commonwealth, 272 Va. 144, 153, 631 S.E.2d 93, 97 (2006).  "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie."  Du v. Commonwealth, 292 Va. 555, 564, 790 S.E.2d 493, 499 (2016) (quoting Sauder v. Ferguson, 289 Va. 449, 459, 771 S.E.2d 664, 670 (2015)).  A reviewing court can conclude that "an abuse of discretion has occurred" only in cases in which "reasonable jurists could not differ" about the correct result.  Commonwealth v. Swann, 290 Va. 194, 197, 776 S.E.2d 265, 268 (2015) (quoting Grattan v. Commonwealth, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009)).  "[B]y definition," however, a trial court "abuses its discretion when it makes an error of law."  Coffman v. Commonwealth, 67 Va. App. 163, 166, 795 S.E.2d 178, 179 (2017) (quoting Commonwealth v. Greer, 63 Va. App. 561, 568, 760 S.E.2d 132, 135 (2014)).  It is within this legal framework that we review the trial court's decision.

We start with the fundamental principle that "[t]he sole purpose of permitting expert testimony is to assist the trier of fact to understand the evidence presented or to determine a fact in issue."  Velazquez v. Commonwealth, 263 Va. 95, 103, 557 S.E.2d 213, 218 (2002).  In a

---

[3] In refusing to allow the witness to testify as an expert, the trial judge stated that the proffered opinion testimony was "getting *kind of close* to the ultimate" issue of fact to "be *decided* by the jury." (Emphases added).  Regardless of the actual basis for the trial court's ruling, this Court may rely on any ground to affirm a judgment, as long as such ground does not require additional factual development.  See Perry v. Commonwealth, 280 Va. 572, 580, 701 S.E.2d 431, 436 (2010) (limiting the holding in Whitehead v. Commonwealth, 278 Va. 105, 677 S.E.2d 265 (2009), because "[f]ailure to make the argument before the trial court is not the proper focus of the right result for the wrong reason doctrine").

Virginia criminal proceeding, a qualified expert witness is allowed to testify if "the subject matter is beyond the knowledge and experience of ordinary persons, such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." Va. R. Evid. 2:702(a)(ii). "[T]he trial judge must determine whether the subject matter of the testimony is beyond a lay person's common knowledge *and* whether it will assist the trier of fact in understanding the evidence or in determining a fact in issue." Utz v. Commonwealth, 28 Va. App. 411, 423, 505 S.E.2d 380, 386 (1998) (emphasis added); see also Dowdy v. Commonwealth, 278 Va. 577, 600, 686 S.E.2d 710, 723 (2009) ("'Expert testimony is admissible when it concerns matters not within the ordinary knowledge of the jury' such that it may assist the jury's understanding of the evidence presented." (quoting Payne v. Commonwealth, 277 Va. 531, 542, 674 S.E.2d 835, 841 (2009))).

However, not all relevant testimony is admissible. Factors that weigh against admitting probative evidence include if "it is confusing and will likely mislead the jury." Farley v. Commonwealth, 20 Va. App. 495, 498, 458 S.E.2d 310, 312 (1995); see also Va. R. Evid. 2:403(a). Another "factor[] that weigh[s] against the admission of relevant evidence" is if that evidence presents a "danger of distracting the jury from the major issues in the case." Byrd v. Commonwealth, 30 Va. App. 371, 376, 517 S.E.2d 243, 245 (1999).

The evidence admitted regarding the Portsmouth use of force policy is important to our analysis because, based on the facts of this case, it was relevant to the appellant's *mens rea*. He introduced into evidence the Portsmouth Police Department policy manual on use of force that was in effect at the time of the offense. The manual provides that "[t]he degree of force used depends on what the officer perceives as reasonable and necessary based upon the totality of [the] circumstances." The document lists seven levels of force. Level four, "Intermediate Techniques," encompasses "intermediate force options such as Aerosol Subject Restraint" sprays

and "Electronic Control Weapon[s]." Level five, "Hard Control Techniques," includes use of "the police baton" and "defensive tactics maneuvers" such as "taking the subject to the ground."

Assistant Chief Kim Wilson of the Portsmouth Police Department testified for the defense about the department's use of force guidelines that make up the policy. Wilson explained that Portsmouth police officers were periodically instructed on its guidelines on use of force. She stated that the guidelines set out different levels of force and that officers are not required to employ each level in sequence if the circumstances require a greater level of force. Wilson also explained that if an officer uses either a spray or an electronic control weapon known as a Taser, he or she is "[n]ot necessarily" "required to use the other."

The appellant testified in his defense. He likewise spoke about the levels of force listed in the Portsmouth Police Department policy. He stated that the level that a police officer should employ depends on the circumstances. He reiterated Wilson's testimony that the department policy does not require a "step by step" use of the different levels of force, explaining instead that a police officer is "trained to use the force that's appropriate to the situation."[4]

The jury was charged with determining the nature of the appellant's act. It was required to consider whether the appellant's killing of the victim was first-degree murder, second-degree murder, voluntary manslaughter, or justifiable self-defense. Consequently, the jury had to decide the appellant's state of mind: whether it was willful, deliberate, premeditated, malicious, intentional, or in the sudden heat of passion. See, e.g., Woods v. Commonwealth, 66 Va. App. 123, 131-32, 782 S.E.2d 613, 617-18 (2016) (explaining that second-degree murder is a malicious killing and voluntary manslaughter is an intentional killing done without malice and in

---

[4] During cross-examination, the appellant stated that he did not employ a different "hard control" technique because "the situation had escalated" and "it was no longer appropriate."

the sudden heat of passion); Archie v. Commonwealth, 14 Va. App. 684, 689, 420 S.E.2d 718, 721 (1992) (defining the intent element of first-degree murder).

In addition, consistent with determining state of mind, the jury had to determine alternatively whether the appellant acted in reasonable apprehension of bodily harm. See, e.g., Diffendal v. Commonwealth, 8 Va. App. 417, 421, 382 S.E.2d 24, 25 (1989) (explaining that a person "is privileged to use reasonable force" when he or she "reasonably apprehends bodily harm by another" and "exercise[s] reasonable force to repel the assault"). If the jury determined that the appellant acted without malice but in fear of harm, it was tasked with deciding whether the appellant acted in self-defense. This defense requires a finding that the force that the appellant used was reasonable in relation to the threatened harm. See Caison v. Commonwealth, 52 Va. App. 423, 440, 663 S.E.2d 553, 561 (2008). "[T]he right to use deadly force in self-defense 'begins where the necessity begins and ends where it ends.'" Couture v. Commonwealth, 51 Va. App. 239, 251, 656 S.E.2d 425, 431 (2008) (quoting Thomason v. Commonwealth, 178 Va. 489, 498, 17 S.E.2d 374, 378 (1941)).

In this case, evidence of the appellant's actions in the context of *his* training and *his* police department policy on use of force was probative of his state of mind in the context of the crimes charged and his defense. See generally Clay v. Commonwealth, 262 Va. 253, 257, 546 S.E.2d 728, 730 (2001) ("Evidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue."). The portion of the Portsmouth Police Department manual regarding its use of force policy was admitted into evidence, and the Assistant Chief testified regarding the training Portsmouth police officers receive regarding use of force. The appellant also testified extensively about his own training and his department's policy. The jury had in evidence the Portsmouth written policy on use of force and heard the accounts of the appellant's actions.

Consequently, it was able to consider the appellant's actions in light of his training and his department's policy on the use of force.

In contrast to Wilson and the appellant, Lyman did not have any particular familiarity with the Portsmouth policy. The appellant's proffer of Lyman's opinion regarding whether he acted in accordance with the Portsmouth policy indicated that it was formed based on other evidence before the jury consisting of the descriptions of the appellant's actions and the Portsmouth manual. As a result, the jury could independently "determine[] intelligently" whether the appellant acted in compliance with the Portsmouth policy, and admitting Lyman's opinion testimony on that point would not have assisted the trier of fact in understanding the evidence.[5] See Pelletier v. Commonwealth, 42 Va. App. 406, 418, 592 S.E.2d 382, 387-88 (2004) (noting that an expert opinion is admissible if the factfinder "'is confronted with issues' that 'cannot be determined intelligently'" without expert insight (quoting Schooler v. Commonwealth, 14 Va. App. 418, 420, 417 S.E.2d 110, 111 (1992))). Accordingly, the trial court did not abuse its discretion in excluding from evidence this piece of Lyman's testimony.

Likewise, Lyman's testimony regarding national police policies on use of force, including his opinions on whether the appellant's actions and the Portsmouth use of force policy complied with generally accepted standards of police departments regarding use of force, would not have aided the jury's determination of the issues before it.[6] See generally United States v.

_____

[5] To the extent that Lyman was allowed to testify regarding matters that appellant testified were part of his training, the admissibility of Lyman's testimony that *was* allowed is not an issue on appeal, and the Court takes no position on the propriety of that testimony.

[6] We analyze this case through the lens of a criminal trial, not a civil one. Compare Caison, 52 Va. App. at 440, 663 S.E.2d at 562 (explaining that to constitute self-defense, "[t]he amount of force used must be reasonable in relation to the harm threatened" (quoting Diffendal, 8 Va. App. at 421, 382 S.E.2d at 26)), with Graham v. Connor, 490 U.S. 386, 393-95 (1989) (holding that the standard for assessing the civil claim that the police used excessive force was whether they acted reasonably under the Fourth Amendment).

Henderson, 409 F.3d 1293, 1304 (11th Cir. 2005) (affirming the exclusion of expert testimony about police training because it would not assist the trier of fact in determining the facts in issue); Farley, 20 Va. App. at 499, 458 S.E.2d at 312 (noting that for evidence to be admissible, "[t]here . . . must be a connection between the evidence and [a] factual dispute in the case"). Whether the appellant acted in accordance with national standards on use of force was irrelevant to the considerations before the jury regarding the criminal charges and related defense. Even if the appellant followed general police policy, he could have been criminally culpable. Further, there was no evidence that the appellant, who testified extensively before Lyman testified, was familiar with national policies on use of force, and thus such policies were not relevant to his state of mind when the offenses occurred. Consequently, this proffered testimony presented the danger of confusing the jury by misleading it to focus on the reasonableness of national and Portsmouth police policies on use of force themselves rather than the reasonableness of the appellant's fear of bodily harm and the level of force that he used in relation to the threatened harm. See generally May v. Caruso, 264 Va. 358, 363, 568 S.E.2d 690, 693 (2002) (noting that the potential of evidence to confuse the jury is a proper consideration in excluding it); Farley, 20 Va. App. at 498, 458 S.E.2d at 312 (discussing that a rationale for excluding probative evidence can exist if it "is confusing and will likely mislead the jury"). Further, the rejected evidence posed the risk of distracting the jury from the determinative issue of whether the appellant used reasonable force in relation to the harm threatened by the victim. See generally Benson v. Commonwealth, 190 Va. 744, 753, 58 S.E.2d 312, 316 (1950) (holding that the trial court properly excluded evidence that "would have tended to confuse the jury and distract attention from the real issues involved"), superseded by statute on other grounds, Code § 19.2-218, as recognized in Wright v. Commonwealth, 51 Va. App. 628, 643, 659 S.E.2d 583, 591 (2008).

Therefore, the trial court acted within its discretion by excluding Lyman's testimony about general police training and standards on use of force widely accepted by law enforcement.

Based on the record, it is clear that the trial court did not abuse its discretion by excluding either Lyman's opinion about whether the appellant's actions complied with the Portsmouth Police Department use of force policy or his testimony regarding "well-established and widely-adopted police training and policies" concerning use of force.[7]

### B. Juror Contact with a Member of the Public

The appellant also argues that the trial court erred by denying his motion for a mistrial based on contact between a juror and a courtroom observer. In addition, he contends that the trial court had an "affirmative duty to further investigate the matter" and, as a consequence, he did not receive a fair trial by an impartial jury.

Before addressing the legal challenges, it is important to review the facts in context. The very specific facts inform the legal analysis regarding whether the trial court correctly denied the motion for a mistrial or erred by not further investigating the purported juror misconduct.

At the beginning of trial, the judge instructed the jury to abstain from discussing the case, "remain[ing] within hearing of anyone who may be discussing it," and talking "with anyone connected with" the trial. After the members of the jury were selected, before court adjourned for the day, the judge told the jurors that if any family members, friends, or neighbors asked about the case, the juror should simply "advise them that you're performing your civic duty." The judge reminded the jurors that they could not "discuss anything—anything—about this case."

---

[7] In light of our conclusion that the trial court did not err, we do not address the harmless nature of the exclusion of this evidence, as argued by the Commonwealth. See, e.g., Swann, 290 Va. at 200, 776 S.E.2d at 269 (noting that Code § 8.01-678 limits reversal based on evidentiary errors to cases in which the error was not harmless).

The guilt phase of the trial lasted six days: two days of jury selection, almost two days of presenting evidence, and jury deliberations that fell over three days. On the second full day of jury deliberations, the judge asked the members of the jury if they had encountered "anything about this case by way of . . . family, friends[,] or neighbors." All of the jurors answered no. Later that day, the court learned that a member of the public who was an observer in the courtroom had spoken with one of the jurors that morning. In response, the judge questioned the observer and the juror each out of the presence of the other.

The observer, "Ms. James," told the court that she "spoke to someone" that she knew without realizing that "he was a juror." She explained that the pair entered "through the gate" at about the same time and that she said "good morning." She further stated that they each asked why the other was at the courthouse, and they both responded vaguely that they were there "for a trial." She also added, "I think he said [that he was here for] this [trial], and I took another elevator when I realized that he was here for that. I went around, came back around, and took the opposite elevator . . . ."

The court then questioned the juror. He explained that he knew the observer "from hanging out at a club" but had not known previously that she was "involved in this case." He said that she "approached" him as he passed through security, signaling, "Pssst, pssst, pssst." When asked if they had a conversation, the juror responded, "No; just that . . . I was doing my civic duty." He added that the woman told him that she was there "to see somebody." He assured the court that they did not discuss the case. The juror confirmed that they used different elevators because "she didn't want to get on the same elevator as me."

The judge also asked Captain Lilley to describe the incident.[8] Lilley explained that "[o]ut of an abundance of caution, somebody came to [him] in reference" to the observer. His "scanner

---

[8] The parties agree that Lilley works for the sheriff's office.

technicians and deputies" reported that the woman said to the juror, "Pssst, pssst, pssst, hold on a minute. I want to talk to you." The two individuals "kind of [gave] each other an elbow," although it was not clear whether the movement was intentional. The captain also told the court that the two walked down the main hall and stood at an elevator together. He noted that the elevator was not the "back elevator" that the jurors had used all week. According to Lilley, as the juror waited for the elevator, the observer "kind of pace[d] around him." Lilley "assume[d]" that the two had a conversation. By Lilley's account, the juror got on the elevator without the woman, and she left the building.

After the court conducted the inquiries, the appellant noted "concern" because the observer "ha[d] been in the courtroom every day." Although he suggested that the observer was attempting to "have some influence or impact upon the juror" and asked the trial court to exclude her from the courtroom, he did not move for a mistrial.

Later, after viewing the courthouse security videos, which contain no audio, the appellant made a motion for a mistrial. He argued that the contradictions between the observer's account and the videos, as well as the juror's use of a different elevator than the one he had used other times, cast doubt on the observer's credibility and suggested her intent to somehow influence the juror. The court denied the motion, emphasizing that the two had not ridden the elevator together.

The next day, the appellant's counsel proffered the courthouse security videos showing the contact between the observer and the juror. Counsel also informed the judge that after court had adjourned the previous day, he saw the observer embrace the victim's mother outside the courthouse. Counsel explained that he raised the matter "to demonstrate again" that the observer "has a vested interest in the case, and her attempt to speak or influence the juror was an

intentional act on her part." Nevertheless, the appellant did not make any motions at that time, nor did he request a hearing. The trial court did not conduct any further inquiry.

The courthouse security recordings show the security scanner at the entry into the courthouse. A video depicts a woman, presumably the observer, leaning over and getting a man's attention as he collects his items from the security checkpoint. It then shows the man, presumably the juror, quickly waving to the woman. Next, the man stands and waits while the woman passes through security. Recordings also show the two walking down a hall together but riding the elevator separately, the man first, then the woman shortly thereafter.

### 1. Bedrock Legal Principles

It is uncontroverted that a criminal defendant has a constitutional right to be tried by an impartial jury. U.S. Const. amend. VI; Va. Const. art. I, § 8. This is one of the most fundamental rights afforded by the criminal justice system. "Because our [Virginia] juries have the dual responsibility of determining questions of guilt and punishment, 'it is not only important that justice should be impartially administered, but it should also flow through channels as free from suspicion as possible.'" Scott v. Commonwealth, 11 Va. App. 516, 519, 399 S.E.2d 648, 650 (1990) (*en banc*) (quoting Wright v. Commonwealth, 73 Va. (32 Gratt.) 941, 943 (1879)). "The Supreme Court has long recognized the dangers to impartiality posed by unauthorized communications between third parties and members of the jury." Stockton v. Virginia, 852 F.2d 740, 743 (4th Cir. 1988). It is a trial court's responsibility to ensure that a jury is free from bias. See Scott v. Commonwealth, 1 Va. App. 447, 451, 339 S.E.2d 899, 901 (1986).

These fundamental legal principles along with the factual backdrop frame our analysis of this issue.

## 2. Motion for Mistrial

"We review [a trial court's] denial of a motion for mistrial for abuse of discretion." Lawlor v. Commonwealth, 285 Va. 187, 220, 738 S.E.2d 847, 866 (2013); see also Hunt v. Commonwealth, 25 Va. App. 395, 399, 488 S.E.2d 672, 674 (1997) (reviewing decision to retain juror mid-trial for an abuse of discretion). Reviewing alleged improper and prejudicial communication with a juror, however, presents mixed questions of law and fact. See generally United States v. Basham, 561 F.3d 302, 319 (4th Cir. 2009) (noting that "the ultimate factual determination regarding the impartiality of the jury necessarily depends on legal conclusions" (quoting United States v. Cheek, 94 F.3d 136, 140 (4th Cir. 1996))). In instances when the facts are not in dispute, the question of whether an *ex parte* discussion with a juror "concerned a matter pending before the jury . . . is an issue of law which we review de novo." See Commonwealth v. Juares, 274 Va. 812, 816, 651 S.E.2d 646, 648 (2007); see also Bristol v. Commonwealth, 272 Va. 568, 573, 636 S.E.2d 460, 463 (2006) (noting that when the facts are undisputed, the remaining question is an "issue of law"). In contrast, when the facts are in dispute, the questions of fact are "best determined by the trial court." Watkins v. Commonwealth, 229 Va. 469, 480, 331 S.E.2d 422, 431 (1985). As a consequence, that court's factual findings are "entitled to great weight." Id.

The established approach to "analyzing allegations of extrajudicial juror contact" is neatly explained by the United States Court of Appeals for the Fourth Circuit. Basham, 561 F.3d at 319 (quoting Cheek, 94 F.3d at 141). "First, '[t]he party who is attacking the verdict bears the initial burden of introducing competent evidence that the extrajudicial communications or contacts were more than innocuous interventions.'" Id. (alteration in original) (quoting Cheek, 94 F.3d at 141); see also Remmer v. United States, 347 U.S. 227, 229 (1954) (holding that extrajudicial communication with a juror "during a trial about the matter pending before the

- 15 -

jury" triggers a presumption of prejudice to the defendant); Riner v. Commonwealth, 268 Va. 296, 316, 601 S.E.2d 555, 566 (2004) (assuming that the juror misconduct was sufficient to shift the burden to the Commonwealth to prove that the *ex parte* communication was harmless).[9] It is only if the challenging party meets this initial burden that the burden "shifts to the prevailing party," in this case the Commonwealth, "to prove that there exists no 'reasonable possibility that the jury's verdict was influenced by an improper communication.'"[10] Basham, 561 F.3d at 319 (quoting Cheek, 94 F.3d at 141); see also Evans v. Commonwealth, 39 Va. App. 229, 236-37, 572 S.E.2d 481, 484 (2002) (noting that the Commonwealth may be able to demonstrate harmlessness).

This two-part analysis requires the trial court to first consider whether the appellant met the burden of showing that the communication was more than something that was simply innocuous. For an exchange to qualify as a private communication that is innocuous, it cannot pertain to "the matter before the jury." Basham, 561 F.3d at 319-20 (quoting Cheek, 94 F.3d at 141). "'[A]ny private communication, contact or tampering, directly or indirectly, with a juror during a trial *about the matter pending before the jury*'" is "'presumptively prejudicial' unless the contact was pursuant to the directions and instructions of the trial court with complete knowledge by both parties." Riner, 268 Va. at 315, 601 S.E.2d at 565 (emphasis added) (quoting Lenz v. Warden, 267 Va. 318, 328, 593 S.E.2d 292, 298 (2004)). In contrast, if such a communication does not "relate to any 'fact in controversy or any law applicable to the case,'"

---

[9] In a situation such as this one, in which the jury has been instructed not to discuss the case with outsiders, this principle comports with the broadly accepted axiom that we presume that jurors followed their instructions. See Prieto v. Commonwealth, 283 Va. 149, 169, 721 S.E.2d 484, 496 (2012).

[10] "[O]nly slight evidence of influence or prejudice . . . should be required to warrant the granting of a new trial." Evans-Smith v. Commonwealth, 5 Va. App. 188, 208, 361 S.E.2d 436, 447 (1987) (second alteration in original) (quoting Crockett v. Commonwealth, 187 Va. 687, 705, 47 S.E.2d 377, 386 (1948)).

then the challenging party has not met his burden and no presumption of prejudice arises. See Juares, 274 Va. at 816, 651 S.E.2d at 648 (quoting Rushen v. Spain, 464 U.S. 114, 121 (1983)).

Here, both the observer and the juror told the judge that they knew each other and exchanged greetings as they entered the courthouse. Both individuals also said that they talked briefly and did not discuss the case. Further, the two stated that they did not ride the elevator together, a fact memorialized in the video.

The appellant argues that the discrepancies between the observer's account, the juror's account, and the video depictions merited a mistrial. After a review of the record, we hold that it supports the conclusion that the discrepancies between the accounts are minor and reconcilable, and the video recordings do not alter this conclusion. Further, the record simply does not support the appellant's argument that the observer and juror spoke about a matter that was before the jury.

The observer indicated that she said "good morning" to the juror; he said that she got his attention by saying "[p]ssst, pssst, pssst." The video additionally shows her leaning over slightly to get his attention, and Lilley's second-hand account indicated that she told the juror to wait "a minute" and that she "want[ed] to talk" to him. Although not apparent on the video, Lilley also reported that the two individuals bumped elbows. The observer stated that they both asked why the other was there and that they each responded vaguely that it was for a trial. The juror said that he told the observer that he was there to perform his "civic duty" and that she informed him that she was there to "see somebody." The video recording of the two independently exiting the elevator shows that the observer actually rode the same elevator as the juror, but at a different time, thus separately.

The actions described by the juror, the observer, and Lilley are not mutually exclusive and in fact, all comport with one person's getting another's attention to greet him. The juror's

account did not match the observer's account verbatim, but the accounts were not mutually exclusive. The video showing the two individuals walking down the hall together briefly comports with their accounts that they had a brief and minimal conversation. The minor differences in their narratives were not noteworthy, nor were they sufficient to meet the appellant's burden of demonstrating that the extrajudicial communication was about "the matter pending before the jury." See Riner, 268 Va. at 315, 601 S.E.2d at 565 (quoting Lenz, 267 Va. at 329, 593 S.E.2d at 298).

The record simply shows that a juror and a courtroom observer greeted each other and spoke briefly while entering the building and walking down the hall together. They then took the elevator separately up to the floor of the courtroom.[11] Nothing in the record suggests that the two individuals spoke of a "matter pending before the jury" or that the exchange was anything more than an innocuous brief conversation.[12] For these reasons, we defer to the conclusions of the trial judge, who was closest to the issue, that the appellant did not meet his burden and no presumption of prejudice attached. See generally Du, 292 Va. at 564, 790 S.E.2d at 499 (noting that in the context of an abuse of discretion standard, the trial judge is closest to the question and

---

[11] The appellant stresses that the juror took the public elevator as opposed to the elevator that the jury members took throughout the trial. This point is not significant because, as the trial court noted, the juror and the observer did not ride that elevator together. In fact, the videos show the observer briefly walking away and using the elevator after the juror, consistent with her representation to the trial court.

[12] This conclusion is supported by examination of Virginia appellate cases considering different types of *ex parte* communications. Compare Juares, 274 Va. at 817, 651 S.E.2d at 648 (holding that the defendant did not establish that the communication was about a matter pending before the jury when court personnel told the jury that the court would not provide an interpreter), with Riner, 268 Va. at 314-15, 601 S.E.2d at 565 (agreeing that the communication with a juror about newspaper headlines regarding the trial pertained to the matter pending before the jury), Brittle v. Commonwealth, 222 Va. 518, 521-23, 281 S.E.2d 889, 890-91 (1981) (reversing the convictions based on ninety unintroduced photographs of the crime scene accidentally given to the jury), and Evans, 39 Va. App. at 239, 572 S.E.2d at 486 (holding that communication from the defendant's uncle to a juror about the defendant's propensity to commit crimes constituted extraneous evidence).

best-suited to resolving certain issues).  Instead, the "burden remained" on the appellant "to establish that he was prejudiced by the . . . communication." See Juares, 274 Va. at 817, 651 S.E.2d at 648 (explaining that "[i]n the absence of a presumption of prejudice, the burden remain[s]" on the party challenging the verdict "to establish that he was prejudiced by the ex parte communication").  For the reasons already stated, the appellant failed to show that he was prejudiced by the interaction.  Consequently, the trial court did not abuse its discretion in denying the motion for a mistrial.

### 3.  Duty to Further Investigate

The appellant alternatively contends that at the very least, the circumstances mandated additional investigation by the trial judge.[13]  He argues that the observer's "close association with" the victim's mother, "her prominent presence in the courtroom" with the victim's family and supporters, "her conduct with the juror," and her possible untruthfulness to the court suggest that she "exerted improper influence upon this particular juror."  The appellant only now on appeal suggests that the court should have placed the observer under oath and asked about her first name, her interest in the case, the nature of her relationship with the victim and his family, and how she did not realize that the person with whom she spoke was a juror.  He also now complains that the trial court did not watch the video or put either the juror or the observer under oath for questioning.  The appellant cites Remmer v. United States, 347 U.S. 227 (1954), for the proposition that he was entitled to a full hearing in which he was allowed to participate in

_____

[13] Despite his argument, the appellant did not ask the trial judge to conduct additional investigation at any point.  When the judge questioned the juror and the court observer, the appellant did not suggest that the judge place them under oath or ask them additional questions.  After appellant's counsel watched the courthouse surveillance recordings, he raised additional concerns to the court.  However, he did not ask for further questioning or a full hearing.  The appellant raised the matter a third time after counsel viewed more security footage and witnessed the observer embrace the victim's mother outside the courthouse.  Nevertheless, he did not ask for additional inquiry.

questioning the juror and court observer. We hold that in the context of this case, the trial court had sufficient information before it to make a reasoned decision, and it did not owe the appellant additional scrutiny regarding the juror.

"When there is a probability that . . . external evidence has influenced the jury, the court has 'the affirmative duty "to investigate the charges and to ascertain whether . . . as a matter of fact, the jury was guilty of such misconduct."'" Harris v. Commonwealth, 13 Va. App. 47, 52, 408 S.E.2d 599, 601 (1991) (second alteration in original) (quoting Evans-Smith v. Commonwealth, 5 Va. App. 188, 209, 361 S.E.2d 436, 448 (1987)); see also Hurst v. Joyner, 757 F.3d 389, 397 (4th Cir. 2014) (holding that a defendant is entitled "to an evidentiary hearing" when he or she "presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury" (quoting Barnes v. Joyner, 751 F.3d 229, 242 (4th Cir. 2014))). This duty on the trial court to investigate purported juror misconduct requires a "showing that extraneous information was injected into the jury deliberations" or that the defendant was prejudiced. See Hall v. Commonwealth, 14 Va. App. 65, 74, 415 S.E.2d 439, 444-45 (1992).

Here, the trial judge promptly investigated the matter when it was first brought to his attention. See Evans, 39 Va. App. at 237, 572 S.E.2d at 484. The judge questioned the observer and the juror individually about their contact. Additionally, the court accepted the representations regarding the courthouse surveillance recordings made by Captain Lilley and the appellant's counsel for purposes of its decision. In the context of this record, the appellant's claim "of possible juror bias is supported only by a 'series of speculative links,'" and the "alleged connection" is "too tenuous to require the court to [have] conduct[ed]" further investigation. See Nelson v. Commonwealth, 268 Va. 665, 671-72, 604 S.E.2d 76, 79 (2004) (affirming and quoting Nelson v. Commonwealth, 41 Va. App. 716, 730, 589 S.E.2d 23, 30

- 20 -

(2003)). Nothing in the record supports the appellant's contention that the observer said anything substantive about the trial to the juror or that the contact prejudiced the appellant. In fact, the juror told the observer exactly what he was instructed by the court to say if approached by anyone, that he was there to do his "civic duty." Consequently, no "probability" existed that "external evidence . . . influenced the jury" or that extraneous information affected the jury deliberations. See Harris, 13 Va. App. at 52, 408 S.E.2d at 601 (quoting Evans-Smith, 5 Va. App. at 209, 361 S.E.2d at 448). There is absolutely no evidence of prejudice to the defendant. The court was under no duty to investigate the matter further, particularly in light of the appellant's failure to request it to do so. See, e.g., United States v. Olano, 507 U.S. 725, 740 (1993) ("Respondents have never requested a hearing, and thus the record before us contains no direct evidence that the alternate jurors influenced the verdict."). For these reasons, the trial court was not obligated to conduct any additional investigation into the appellant's allegation of inappropriate communication between the juror and the observer.

### III. CONCLUSION

We hold that the trial court acted within its discretion by refusing to allow proffered expert testimony regarding whether the appellant's actions complied with the Portsmouth Police Department use of force policy and about widely accepted national standards on police use of force and certain police procedures. In addition, the court acted within its discretion by denying the motion for mistrial based on juror contact with a courtroom observer and no formal hearing or additional inquiry was required. Accordingly, we affirm the conviction for voluntary manslaughter.

Affirmed.